Clifford GOWDY, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

WHITTAKER ELECTRIC COMPANY, a corporation, Third-Party Defendant.

No. 4897.

United States District Court
W. D. Michigan, S. D.

June 24, 1967.

Opinion on Damages July 12, 1967.

Marcus, McCroskey, Libner, Reamon, Williams & Dilley, Grand Rapids, Mich., for plaintiff, William G. Reamon, Grand Rapids, Mich., Harry M. Philo, Muskegon, Mich., of counsel.

Harold D. Beaton, U. S. Dist. Atty., Grand Rapids, Mich., Eugene Hamilton, Dept. of Justice, Washington, D. C., for defendant.

Wheeler, Upham, Bryant & Uhl, Grand Rapids, Mich., Cholette, Perkins & Buchanan, Grand Rapids, Mich., for third-party defendant, Buford A. Upham, William D. Buchanan, Grand Rapids, Mich., of counsel.

## OPINION

FOX, District Judge.

This matter involves a personal injury action brought by plaintiff, Clifford Gowdy, against defendant, United States of America, pursuant to the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b) and 2671 et seq., for the recovery of damages allegedly caused by the defendant. A third party action was subsequently instituted by the defendant as third party plaintiff against Whittaker Electric Company, employer of plaintiff. The third party action was separated from plaintiff's suit on August 15, 1966.

The Tort Claims Act provides in part that the United States District Court "shall have exclusive jurisdiction of civil actions on claims against the United States for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of *any employee of the Government* while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346(b). (Emphasis supplied.)

On December 20 through December 23, 1966, a trial was held before the court

without a jury. The facts stand as follows:

The United States contracted with Whittaker Electric Company to completely replace and renew the foghorn and light, and other existing equipment at the south breakwater lighthouse in Muskegon, Michigan.

The lighthouse is located at the extreme end of the south breakwater guarding the channel from Lake Michigan into Muskegon Lake. The breakwater runs from the east shore of Lake Michigan near Muskegon in a generally westward direction for a distance of approximately a thousand feet. It consists of concrete and stone, and is supported by piles sunk into the lake bottom.

Constructed of heavy gauge steel, the lighthouse rests on an elevated foundation which rises about three feet above the breakwater. It has a single room called the "machinery room" (approximately eight by ten feet) which houses electrical generators and machinery.

Projecting up from the roof of the machinery room is an enclosed tower on which the foghorn and light are mounted. The only means of reaching the top of the tower is a ladder running from the floor of the machinery room to an opening in the roof, through the enclosed tower to the top.

Since the base of the tower is not large enough to cover the entire roof of the machinery room, it is possible for one to stand and walk on a working platform on the east side of the roof in a rectangular area four by eight feet.

There is a radial davit which rotates three hundred sixty degrees on the northeast edge of the roof of the machinery room. At its base the davit is perpendicular to the roof of the machinery room. From its base the davit projects straight up above the roof to a height of about six feet, and then begins gradually to curve away from the perpendicular line of its base to a height of about ten to twelve feet.

There is a circular ring at the upper end of the davit called an eye, to which lines, tackles, and hoists may be attached. The davit is made of heavy gauge steel, and is fitted into a socket in the roof of the machinery room. The davit is completely exposed to the elements, so that because of rust, it is necessary to use a heavy 24-inch or larger pipewrench to turn or rotate the davit.

Whittaker Electric Company's employees began work on the lighthouse about August 1, 1963. The crew performing the work consisted of a superintendent, Fred Curow; a foreman, Charles Smith, who was also a journeyman electrician; and plaintiff, a second journeyman electrician.

Plaintiff, in addition to helping remove, repair and replace machinery and electrical equipment in the lighthouse, also assisted in the removal and replacement of the steel door of the machinery room at the beginning and end of each working day. The door was removed and replaced through the use of a chain hoist which was connected by a Whittaker employee to the davit on the edge of the roof of the lighthouse. This procedure was used primarily to facilitate the removal of old equipment and the installation of new equipment in the machinery room.

On August 23, 1963, the Whittaker Electric Company crew, consisting of the foreman and plaintiff, arrived at the lighthouse by boat, as they had done previously for about three weeks.

The foreman and plaintiff worked on and about the lighthouse until about 4:00 P.M., when they began preparing to suspend operations for the day.

Plaintiff, as he had done eight to ten times before that day, went to the roof of the machinery room by way of a ladder made of rungs about one foot in width and attached about one foot apart on the outside of the machinery room. Plaintiff then began operating the ratchet hoist to replace the machinery room door. The ratchet hoist was suspended from the eye of the davit, and attached to the other end of the hoist

through a ratchet was a chain which was also attached to the door.

As the hoist was operated, the davit took up slack in order to lift the door; it could also be let-off to lower the door. To operate the lift in this manner, plaintiff had to stand about one foot from the edge of the roof, lean forward toward the edge of the roof, and reach over his head with one of his hands to grasp the end of the ratchet hoist handle. The ratchet was about eighteen inches long. Because of his height he was only able to reach approximately three inches of the handle of the ratchet.

While in this position, after having taken up the slack in the chain, and as he was attempting to operate the handle of the ratchet hoist to raise the steel door so that it could be swung into position, and while the door was still resting on its bottom edge, plaintiff lost his balance and fell from the top of the roof to the concrete foundation.

As a result of this unfortunate accident, plaintiff sustained serious injuries, including comminuted fractures of both heels which caused, besides pain and suffering, hospitalization and treatment over an extended period of time, loss of earnings, and medical expenses.

Plaintiff alleges that the defendant, among other things, was negligent in hiring an incompetent contractor and in not exercising reasonable care in the performance of its right of control over plaintiff's employer; negligent in furnishing unsafe equipment and in acquiescing in tortuous conduct and in giving ambiguous orders to an independent contractor; and negligent in failing to warn of the dangerous condition of the lighthouse, and in failing to provide a reasonably safe place to work.

The United States defends by claiming it owed no duty to plaintiff Gowdy because he was an employee of an independent contractor, and also because the hazard was obvious and plaintiff was guilty of negligence. Essentially, defendant claims duties and obligations existed between the independent contrac-

tor and plaintiff, but not between plaintiff and defendant.

Plaintiff also contends that maritime law applies to his claim under the Federal Tort Claims Act.

■ It is axiomatic that in the absence of a maritime status between the parties in a personal injury action, the traditional test of locality of the tort governs the question. Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Atlantic Transport Co. of West Virginia v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914); The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866).

Although the "locality" rule is simply stated, its application is rather difficult, as is evidenced by the number of cases which have dealt with it. Our burden is considerably lightened, however, by the recent decision of the Sixth Circuit Court of Appeals in Wiper v. Great Lakes Engineering Works, 340 F.2d 727 (C.A.6); cert. den. 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965), which involved an action against a dock owner for the death of plaintiff's husband who was found drowned in a slip.

In reaching its decision, the court said:

"Under the allegations of the complaint, defendant's negligently kept dock resulted in decedent's death by drowning in navigable waters, and therefore plaintiff contends that the tort should be deemed to have occurred in navigable water. However, docks and wharves are considered as extensions of land, (citations omitted), and therefore the negligently maintained dock which presumably caused the decedent to fall was land, and the decedent was on land at the time he was caused to fall. Thus, the tort was complete before decedent ever touched the water and this being true, the subsequent drowning is significant not to *determine the maritime or non-maritime nature of this action but only as it relates to damages*, (citations omit-

ted)." 340 F.2d at 730. (Emphasis supplied.)

In the instant case, plaintiff's injury occurred as a result of defendant's failure to guard the second deck of the lighthouse.

In Hastings v. Mann, 340 F.2d 910 (C.A.4); cert. den. 380 U.S. 963, 85 S.Ct. 1106, 14 L.Ed.2d 153 (1965), the court observed with respect to lighthouses that:

"Lighthouses, beacons, buoys and other navigational aids are not encompassed within the land extension doctrine. Usually, they are surrounded by water and they have historically been regarded as subjects of Admiralty jurisdiction. They are readily distinguishable from piers and wharves extending over navigable waters and designed and used for the purpose of providing access to vessels afloat for people and land based vehicles and equipment." 340 F.2d at 911.

The Muskegon lighthouse is a beacon which leads the ships safely into the Muskegon Harbor. It functions solely as an essential navigational instrumentality.

A lighthouse is not encompassed within the extension of land doctrine, and it is equally true that a breakwater is distinguishable from a wharf or pier.

Robert L. Jenkins, director of safety for the United States Army Corps of Engineers from approximately 1948 to 1964, testified that the purpose of a breakwater is to break the force of the waves so that they expend their energy as they spill over it

James A. Gilligan, officer in charge of the Muskegon Coast Guard Station in 1963, and safety officer for that unit, stated that water did spill over the breakwater and that during the winter months it was not unusual for the lighthouse to be covered with ice.

Plaintiff's and his foreman's use of a boat to travel to and from the lighthouse is further evidence of the maritime nature of the breakwater.

Although a breakwater may recommend itself as an attractive fishing retreat during the summer months, this is not sufficient in our eyes to include it in the category of wharves and piers for the purpose of defining admiralty jurisdiction. Accordingly, we hold that maritime law is applicable.

"'[A]dmiralty courts, when invoked to protect rights rooted in state law, endeavor to determine the issues in accordance with the substantive law of the State.' Garrett v. Moore-McCormack Co., 317 U.S. 239, 245, 63 S.Ct. 246, 251, 87 L.Ed. 239 [245]." Hess v. United States, 361 U.S. 314, 319, 80 S.Ct. 341, 346, 4 L.Ed.2d 305, 310 (1960).

We, therefore, look to the substantive law of Michigan to determine whether defendant as a landowner negligently breached a duty to plaintiff.

Negligence, as Holmes once observed, is a "featureless generality" which because it is subject to the crosscurrents of life, is constantly in a state of legal flux. It is not a fixed concept, but an evolving standard designed to prevent or deter what reasonable people believe is, for the lack of better terms, anti-social or wrongful conduct. Its essence is lack of care.

The circumstances of each case supply the features from which breaches of duty and negligence arise.

Chief Justice Cooley in Detroit & Milwaukee R. Co. v. Van Steinburg, 17 Mich. 99, 118, 119 (1868), stated that negligence "consists in a want of that reasonable care which would be exercised by a person of ordinary prudence *under all the existing circumstances, in view of the probable danger of injury.*" (Emphasis supplied.)

Before Spence v. Three Rivers Builders & Masonry Supply, 353 Mich. 120, 90 N.W.2d 873 (1958), Michigan courts "gratuitously [conferred]" honorary degrees upon the abstract concept of reasonable care.

In Spence, Justice Voelker, speaking for the Court, said:

"Care does not increase or diminish by calling it names. We think the abstract concept of reasonable care is in itself quite difficult enough to grapple with and apply in our law without our courts gratuitously conferring honorary degrees upon it. There is only *one* degree of care in the law, and that is the standard of care which may reasonably be required or expected under all the circumstances of a given situation. * * *" 353 Mich. at 130, 90 N.W.2d at 878.

Justice Voelker's admonition to analyze all of the evidence in each case and to avoid uncritical application of general rules is particularly appropriate to the present case, since the thinking inherent in such "open sesame phrases" as whether a danger was obvious, or whether defendant controlled the employees of the independent contractor, or whether there was a duty owing plaintiff from defendant, could make for simple and swift resolution of this case, despite a multitude of facts and circumstances which militate to the contrary.

Some courts in situations where there is fault resulting in harm to another have excused the wrongdoer from liability by saying there was no duty owed by the wrongdoer to the injured party.

Cases in which an injured employee of an independent contractor sues a landowner for injuries sustained as a result of claimed negligence on the part of the landowner lend themselves to temptations to simplism. It is important in these cases to distinguish " * * * between the problem of restricting liability to a negligent party, and the problem of restricting the liability of the defendant even though he was negligent * * *." This distinction " * * * is one that is fundamental to an understanding of cases involving personal injuries for open and obvious dangers."[1]

The uncontradicted evidence establishes that the second deck of the lighthouse was originally protected by guardrails; that the guardrails were removed after they had fallen into a state of disrepair because of icing and severe climatic conditions; and that defendant, aware of this unsafe condition, nevertheless invited the employees of Whittaker to use the area while they were working on the lighthouse.

James Gilligan testified that in obedience to Coast Guard regulations, he required Whittaker employees to replace and lock the door to the machinery room

---

1. Keeton, Personal Injuries Resulting from Open and Obvious Conditions, 100 U.Pa.L.Rev. 629, 632 (1952). In the same article Keeton observed at page 632:

"While statements are frequently made that without a duty there can be no negligence, this is misleading and not in accordance with the usage herein. A driver of a car can be negligent as a matter of law in failing to give a proper signal when turning to the left or right and yet not be liable to a passenger-guest who is hurt in precisely the manner that should have been anticipated. This is because for *various reasons of policy*, other than the need for limiting liability in some manner, courts have concluded in view of the relationship between the parties *to restrict the defendant's duty of care.* Thus, conduct more reprehensible than negligence must be found to justify the imposition of liability on a defendant to a passenger-guest in an automobile or to a trespasser on land. *The lack of a duty in such instances does not mean and should not mean that the defendant has acted prudently.* It simply means that even though he was guilty of anti-social conduct and *conduct that should be discouraged,* the achievement of other *socially desirable ends or objectives that will be hindered by shifting the loss from the defendant to the plaintiff is a weightier consideration.* Admittedly, a judge will often say that there was no duty to do something *when in reality he means* that it could not be said that it was negligence not to do it. This is unobjectionable since there is no liability without fault, i.e., negligence, *but the lack of duty in such a case is covered by the general requirement of fault, whereas there are numerous examples of non-liability even though the fault or negligence requirement of liability is satisfied."* (Emphasis supplied).

at the end of each working day. He admitted he told Frederick W. Curow, administrative supervisory employee of Whittaker, that the davit would be in good working order if he decided to use it. Gilligan also stated that he attempted to visit the site daily and was aware that the davit was being used, although he could not recall the kind of device being used on it. He estimated that during the course of their work on the lighthouse the employees of Whittaker probably removed and replaced the door at least eight to ten times.

Defendant contends that notwithstanding any knowledge it may have had of plaintiff's use of the second deck of the lighthouse, it did not violate any of its duties to plaintiff.

If the second deck of the lighthouse were not a working platform, and if the defendant in this case were a typical landowner unaware of the sophisticated nuances of safety engineering, we might probably agree that defendant discharged its duties to plaintiff.

■ A knowledgeable landowner, however, experienced and skilled in advanced techniques of safety engineering, familiar with the hazards of construction, and who in the exercise of prudence and due care could have prevented the accident because of its reservoir of safety engineering knowledge, should not be measured by the standards governing a landowner's duties to an invitee where the knowledgeable landowner has the resources to remedy the defect, and particularly where the work in issue is hazardous.

In "Tort Liability of Owners and General Contractors For On-The-Job Injuries to Workmen," 13 UCLA L.Rev. 99, 124 (1965), an analysis of California's Workmen's Compensation Act and relevant cases, Wayne A. Brooks, concluded with this pertinent observation:

"Even before owners and general contractors are brought within Workmen's Compensation, the 'independent contractor' concept should be abandoned *in the interest of clarity in analysis. The crucial question is the extent of involvement of owners with job conditions, not responsibility on respondeat superior grounds. The knowledgeable owner, who is familiar with the hazards involved and who could prevent injury, should be viewed differently from the owner who, by hiring a responsible contractor, has done as much as can be reasonably expected of him.* The former class of owners is expected to take precautions under the inherently dangerous activities rule, and since the purpose of liability is the same in either case, it necessarily follows that the duties should be the same under the statutory safety provisions." (Emphasis supplied.)

Viewing the proposition according to the teachings of Spence v. Three Rivers Builders & Masonry Supply, supra, in Michigan we can say that the superior knowledge of such a landowner is a distinguishing circumstance in the totality of circumstances which sets him apart from the general type of landowner such as a householder, or small businessman unaware of safety engineering.

Safety engineering has acquired a position of a fine art, whereby accident-prone situations are readily ascertainable and reasonably avoidable by the timely application of corrective practices and methods. As a profession it has developed clearly acceptable and well defined standards.

As a leader in the field, the United States Government is in the forefront in advancing safety standards. The United States is among the most knowledgeable in the field of safety engineering.[2]

There is a continuing President's conference on industrial and construction safety. The Bureau of Labor Standards is one of the prime formulators of safety

2. Tools of safety engineering are basically: (1) safety standards, safety codes, safety practice sheets, bulletins and memoranda; (2) safety manuals; (3) statistics; (4) technical journals; (5) safety equipment catalogs; and (6) past accidents.

standards in the United States. The Army Corps of Engineers, the United States Navy, its Bureau of Yards and Docks, the United States Coast Guard, General Services Administration, and practically every unit involved in public buildings, installation, construction, maintenance and repair, have well established, coordinated, and defined safety practices and standards.

Many of these governmental agencies work in close harmony with private organizations, such as the American Society of Safety Engineers, and the National and Local Chapters of the General and Associated Contractors of America. They are all fully aware of the latest safety techniques and procedures.

█ Witnesses Bisel and Jenkins are professionals in the field. They were employed by the United States Government at the time of this accident. Bisel was the top ranking civilian safety employee in the Coast Guard field of safety engineering. Their knowledge was the knowledge of the United States, as the United States acquires its knowledge in the only manner it can, through its officers, agents, servants and employees.

Unquestionably the United States has far greater knowledge in this field than Gowdy or Whittaker. This superior knowledge is important in recognizing existence of risk. The eminent scholars and lawyers of the American Law Institute declared its importance in 2 Restatement, Torts, § 289. This section provides in part, as follows:

"Recognizing Existence of Risk

The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising

\* \* \* \* \* \*

(b) such *superior attention, perception, memory, knowledge, intelligence, and judgment* as the actor himself has." (Emphasis supplied.)

Frederick F. Bisel, a civilian safety engineer for the United States Coast Guard from September 15, 1948 to December 30, 1965, testified that the second deck of the lighthouse was an unsafe working area, absent the required guardrails. He stated that the Whittaker employees did not go out to the lighthouse with guardrails as a part of their thinking, but rather to do a job, and that it was the responsibility of other people to protect them against hazards inherent in their work. "We give a man safety goggles against splashes of acid. Are we going to depend on him to protect his eyes? We give men hard hats against falling objects. Are we going to depend on him to buy his hard hat? No, sir. We are going to buy the hard hat and give it to him, and we are going to provide him with all personal protective protection, apparel and equipment, necessary to protect this man from the hazards inherent to this work. This is management's responsibility." (Record, p. 147.)

Bisel further testified that the publication, "Manuals—Corps of Engineers, U. ᴐ. Army, EM 385–1–1 13 March 1958, 'Safety—General Safety Requirements,' " a primary source of safety regulations and procedures used by the Coast Guard at the time of the accident, required among other things, that elevated working surfaces be protected with guardrails and toeboards.[3]

3. At page 78 of the Manual under the heading, "Guarding," the following regulations are set forth:
"20–21. Runways, ramps, platforms, elevated work surfaces, and scaffolds of 6 feet in height or more above the adjoining surface shall be effectively guarded as follows:
a. Guard rails of such height and stability as the nature of the work being performed, or contemplated use, may require (wooden guard rails shall be rigidly supported at intervals not greater than 8 feet). The height may vary from 36 to 42 inches and intermediate rails shall be provided.
ᴴ. Toeboards not less than 6 inches in height or side screens shall be provided as necessary to protect workmen, the public, or property below the working level from falling objects.
\* \* \* \* \*
f. During construction, all openings —floor, roof, stairwell, shaftways, pits,

He also stated that each year in observance of January as "Falls Prevention Month," as annually proclaimed by the Treasury Department, his office would publish a bulletin directing that each unit inspect all of its elevated working areas. To obviate the necessity of publishing an annual bulletin, he assisted in 1963 in publishing General Administration Instruction No. 15–63 or Commandant Instruction 5100.3A, which provides in part that each unit safety officer shall determine that elevated surfaces are properly guarded to prevent falls to persons, insure that personnel are instructed on the importance of placing guardrails around floor and deck openings when covers are removed, *inspect permanent guard railings for deterioration and ascertain that safety belts and life lines are used for all hazardous elevated work.*[4]

These regulations are important as evidence of defendant's application in practice of its superior knowledge of safety engineering.

■ Defendant argues that despite any knowledge which it may have had of safety engineering, the plaintiff failed to establish liability since the absence of a guardrail was an open and obvious danger, and furthermore, because there was no proof the defendant exercised any control over Whittaker's employees. Not all supposedly open and obvious dangerous situations free a defendant from liability or preclude a plaintiff from recovery.

In Ackerberg v. Muskegon Osteopathic Hospital, 366 Mich. 596, 115 N.W.2d 290 (1962), a case involving an appeal from a directed verdict in a personal injury action brought against the defendant, Muskegon Osteopathic Hospital, for failure to erect a guardrail or other protection on a platform around the front of defendant's emergency entrance, Michigan's Supreme Court acknowledged that a landowner may have a duty to protect invitees from so-called open and obvious dangers where the invitee's attention is distracted. Justice Kavanagh, speaking for a unanimous court, said:

"The test, then, in the instant case is, would all reasonable men agree as to whether or not defendant hospital had a duty to construct a guard or protection around the rear platform which was used by the general public entering and leaving the emergency entrance of the hospital in an excited state.

"The declaration alleges that defendant hospital knew or ought to have known that people using the emergency entrance would be under the strain of physical and emotional shock and, in the exercise of reasonable care, should have provided a guard of some type on this platform.

"We think when situations such as this arise, considering the attendant excitement and mental and emotional condition of the individuals entering and leaving an emergency entrance to a hospital, reasonable men might dif-

and similar unguarded locations shall be provided with an inclosure guard securely anchored in the opening (plate 19). If the use of such a guard is not considered feasible, then the openings shall be decked over solid or closed with material and bracing of sufficient strength to support any load which may be imposed, and properly anchored to prevent accidental displacement."

4. Paragraphs 1(h), (i), (j) and (k) of enclosure 2 to the Instruction provide that each unit safety officer shall:
"h. *Determine that elevated surface areas are properly guarded to prevent falls of persons or falling objects and that stairways, steps, and* ladders *are in good repair and meet the standards for elevations, height and width of risers, lighting, and handrails.*
i. Make sure that personnel realize the importance of placing guards around floor and deck openings when covers are 'removed.
j. *Make frequent inspections of floors, docks, stairways, ladders, and permanent guard railings for deterioration which may cause a breakthrough.*
k. Ascertain that safety belts and life lines are utilized for all hazardous elevated surface work." (Emphasis supplied.)

fer as to whether or not there was a necessity for the construction of a guard rail to protect those on or about the platform as business invitees." 366 Mich. at 601, 115 N.W.2d at 293.

See also Gugel v. Sears, Roebuck & Company, 308 F.2d 131 (C.A. 6, 1962), cert. den. 371 U.S. 962, 83 S.Ct. 542, 9 L.Ed.2d 510 (1963).

Prosser also recognizes that circumstances may transform an obvious danger into *a latent, or at least deceptive danger.*

"In any case where the occupier, as a reasonable man, should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition, something more in the way of precautions may be required. This is true, for example, where there is reason to expect *that the invitee's attention will be distracted, as by goods on display, or that after lapse of time he may forget the existence of the condition, even though he has discovered it or been warned; or where the condition is one which would not reasonably be expected,* and for some reason, such as arm full of bundles, it may be anticipated that the visitor will not be looking for it. It is true also where the condition is one such as icy steps, which cannot be negotiated with reasonable safety even though the invitee is fully aware of it, and, because the premises are held open for him for his use, *it is to be expected that he will nevertheless proceed to encounter it. In all such cases the jury may be permitted to find that obviousness, warning or even knowledge is not enough.* It is generally agreed that *the obligation as to the condition of the premises is of such importance that it cannot be delegated, and that the occupier will be liable for the negligence of an independent contractor to whom he entrusts maintenance and repair."* Prosser, Law of Torts, 404, 405 3rd Ed. 1964.

Robert L. Jenkins stated that guarding is absolutely necessary to protect workers from falling off elevated working surfaces. He observed that it must be recognized that a worker is not hired fundamentally to watch his step, and that a worker on an elevated working platform may because of distractions or lack of contrasts in the surrounding environment, be led off the edge even though he may think he is acting carefully.

"Q. What is involved in a recognition of danger by an industrial worker? What are the elements of the recognition of danger?

A. Well, in the recognition of danger in an industrial worker, a good deal depends on the environment setting that the particular situation might be in, and the competition or the burdens upon the worker which compete with this recognition. This might be noise, it might be the lack of contrast, it might be lighting. There are many, many things that could compete with it and, Mr. Philo, this really is the principle of guarding.

Q. What is involved in guarding as such?

A. Well, guarding is a recognition of this matter of recognizing danger by a worker. We have found in analyzing accidents and interrogating workers, that they had these things competing with them. And we must recognize one thing, a worker is not hired fundamentally to watch his step. Or to be careful. And this is very much of a secondary consideration. He doesn't want to get hurt. *A worker very often recognizes, he thinks he is being careful, he wants to be careful. Most people, workers that get killed, get hurt, feel that they are being careful."* (Record, pp. 33, 34.)

\* \* \* \* \* \*

"Q. Why do you say and why has your testimony been that the only way of preventing a fall in the exercise of due care from an elevated surface is a guardrail?

A. Well, this comes back, Mr. Philo, to the fact that a danger exists whenever anybody goes above the

ground level. The hazard exists if there is an opening either in the floor or the edge that an individual might fall from. And then the risk is the probability of workmen either falling through the hole or stepping from the edge.

Now, on a platform, for example, the further one gets from the edge of a hole, the risk diminishes. And the closer they get to the edge, the more acute the risk becomes.

*I said, Mr. Philo, that the guardrail was the only means of effectively controlling this risk is because the workman at the edge or exposed to this hazard, he may feel he is performing in a very safe manner; but we have these subtle situations of something leads him, distracted his attention, leads him and will lead him right from the edge. Or it might be a contrast. And this is very true, we find statistically and through observation, in the matter of contrast, where any structure around water particularly, concrete and water on certain situations, there's no contrast. And an individual may feel he is perfectly safe and working in a safe manner, and something which seems to be an obvious hazard is a very subtle one; and he is led right off the edge unless he is physically restrained."* (Record, pp. 39–41.) (Emphasis supplied.)

From the testimony of Bisel and Jenkins, it is clear defendant was aware, or should have been aware, that plaintiff's attention while operating the davit on the second deck would be primarily focused on removing and replacing the door, and distracted from the subtle and alluring hazard before him which led him from the edge into space and his injury, even though at the time he may have thought he was acting carefully. Such knowledge is a part of safety engineering expertise.

Both Jenkins and Bisel agreed that the work plaintiff was engaged in at the time of the accident was hazardous. Bisel observed that in lieu of removing and replacing the door each day, the machinery room could have been shored up with a temporary door, thus entirely avoiding the hazardous occupation.[5]

On the issue whether it was necessary for plaintiff to establish defendant exercised control over Whittaker's employees, in Ackerberg v. Muskegon Osteopathic Hospital, supra, the court cited with approval Section 343 of Restatement of Torts, Second, which provides:

"§ 343. Dangerous Conditions Known to or Discoverable by Possessor.

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if,

(a) *knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and*

(b) *should expect that they will not discover or realize the danger, or will*

---

5. "A. I'll consider this a hazardous job to the feet, to the hands, to the head, to falls; I'll consider that this panel should have been removed once and some facility made for temporary shoring up of this place where the door could have been a little wider and lock the door.

But every day that they moved this, this jury-rig [jerry-rig], they were not only endangering somebody falling and people's heads, toes, and hands, this is a heavy object and it was operated by an uncontrolled device.

\*　　\*　　\*　　\*　　\*

"A. I think if all the parties involved, in this would have had any recognition of safety and were real concerned, that is, those officials who had to do with this, would have sure made arrangements that this door wouldn't have to be taken off every day; there would have been some arrangements made this could have been shored up with a temporary door, and this door would have been made out during the course of the contract. The people is what we are vitally interested in for safety." (Record, pp. 127–8.)

*fail to protect themselves against it, and*

(c) *fails to exercise reasonable care to protect them against the danger."* (Emphasis supplied.)

The primary purpose of Section 343 is to require a landowner to protect invitees against dangerous conditions on his premises when he realizes or should realize that they will fail to protect themselves against the danger.

Knowledge of construction, maintenance and repair of lighthouses on navigable waters and the dangers inherent in their conditions and environs is uniquely within the cognizance of the United States and precisely within the jurisdiction of the Coast Guard. The United States should have anticipated harm to invitees using the second deck of the lighthouse, despite the invitee's knowledge of its dangerous conditions.

Section 343(A) of Restatement of Torts, Second, makes the intent of Section 343 quite clear, as it states:

"343 A. Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated." (Emphasis supplied.)

Control is not a necessary element for the application of Section 343, or for the imposition of liability where the issue is whether a landowner such as the defendant has a duty to maintain his premises in a safe condition for the employees of an independent contractor.

In McCord v. U. S. Gypsum Co., 5 Mich.App. 126, 145 N.W.2d 841 (1966), the defendant, a landowner, was held liable to the employee of an independent contractor for failing to warn the employee of the existence of a skylight on the roof of its plant.

The case at bar is similar to McCord insofar as we have found that the defendant should have been aware that the plaintiff would not, while operating the davit, recognize the danger inherent in working on an unguarded elevated working surface in a concrete and water environment, and that the absence of a guardrail presented a deceptive and hidden danger to the plaintiff.

Defendant's claim that plaintiff was guilty of contributory negligence is unfounded. From the testimony of defendant's former safety experts, we conclude that the attention of a reasonable and prudent workman, such as plaintiff, while working on the second deck of the lighthouse, would be concentrated almost exclusively on his work effort and that lulled into a sense of security, he could easily be lured into a position of danger.

Under such circumstances, a workman would not be guilty of contributory negligence. Plaintiff was not guilty of contributory negligence.

Even if plaintiff were guilty of contributory negligence, it would not defeat recovery, since under admiralty law comparative negligence is the rule.

A prerequisite to liability under the Federal Tort Claims Act is that the act or omission be by an "employee of the United States." In Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), Justice Frankfurter said:

"The broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws." 350 U.S. at 68, 69, 76 S.Ct. at 126.

In this case we have the omissions and acts of James Gilligan, the officer in

charge of the Muskegon Coast Guard station at the time of the accident and the omissions of the Coast Guard officers along the chain of command.

Some time before August 13, 1963, the second deck of the lighthouse was equipped with guardrails which conformed to the standards of construction and safety requirements of the Coast Guard for elevated working platforms. After they had fallen into a state of disrepair, James Gilligan and his superiors failed to repair or replace them, even though they were, or should have been, fully aware that reasonable care demanded this be done. The Commandant's safety policy admits of no other conclusion.

Lest it be construed that we are measuring the defendant's conduct by its own standards and regulations as opposed to the common law concept of due care, we emphasize that the Coast Guard regulations are important only as evidence of the defendant's knowledge of the hazardous condition which was created absent the required safeguards.

In reference to this, the cases cited by defendant, United States v. Page, 350 F.2d 28 (C.A.10, 1965), cert. den. 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966), Grogan v. United States, 341 F.2d 39 (C.A.6, 1965), Kirk v. United States, 270 F.2d 110 (C.A.9, 1959), and Richardson v. United States, 251 F. Supp. 107 (W.D.Tenn., 1966), and the recent case of Eutsler v. United States, 376 F.2d 634 (C.A.10, 1967, April 12, 1967), are inapposite, since in each of those cases the plaintiffs attempted to recover primarily on the ground that the defendant had by contract and conduct (government safety program) assumed responsibility for the safety practices of independent contractors.

Further, none of the above cases treated the question of whether the government has a duty to maintain its premises in a safe condition for its invitees.

Also, Eutsler v. United States, supra, United States v. Page, supra, and Richardson v. United States, supra, are distinguishable in that they involve attempts by employees of independent contractors to recover for injuries resulting from explosions on premises of independent contractors.

Eutsler, supra, relies substantially upon the general rule found in a special note to Chapter 15 of Restatement of Torts, Second, at pages 17–18 of the American Law Institute's Tentative Draft No. 7. It stated in effect that since a workman's recovery is generally regulated by Workmen's Compensation Acts, it is unnecessary to impose liability upon one who hires an independent contractor because the cost of the insurance premiums out of which the compensation is to be paid is included in the contract price of the independent contractor who carries the insurance.

Significantly, this special note to Chapter 15 was not included in the final publication of the Restatement of Torts, Second. The Restatement is a distillation of law from accumulated sources to the time of its publication. Exclusion of this commentator's note in the final draft impresses us as a manifest intent not to consider it a part of the restated law.

The Michigan Supreme Court has favorably received the Restatement of Torts and has by decided cases adopted it in many instances.

We hold that the special note in Chapter 15 of Restatement of Torts, Second, found at pages 17–18 of the American Law Institute's Tentative Draft No. 7, is not a pertinent part of the rationale of the controlling law in Michigan.

The case of Corban v. Skelly Oil Co., 256 F.2d 775 (C.A.5, 1958), cited in Eutsler, supra, is inapposite. There an employee of an independent contractor was injured while repairing a pump in an oil well for Skelly Oil Co. The court held that if the work was inherently dangerous, the independent contractor's employee became, for the purpose of such work, an employee of Skelly Oil Co. with his rights of recovery limited solely to benefits under the Arkansas Workmen's Compensation Act. This is not the law in the State of Michigan.

Conversely, Woolen v. Aerojet General Corp., 57 Cal.2d 407, 20 Cal.Rptr. 12, 369 P.2d 708 (1962), is apposite. There in an action for the death of an employee of independent contractor engaged to paint the interior of a tank, the California Supreme Court held that the evidence supported a finding that the owner of the tank, knowing of the danger, failed to exercise reasonable care to see that independent contractor took adequate precautions.

It also held employees of an independent contractor come within the word "other," as used in Section 413 of Restatement of Torts, Second.

Defendant says it owed no duty to Gowdy. Risk and duty are related.

Duty is born of danger to others reasonably perceived by the person charged with guarding against the hazard.[6]

Seavey, Mr. Cardozo and the Law of Torts, 48 Yale L.J. 90, 399, 400 (1939), analyzes among others, three hallmark opinions of Justice Cardozo on the law of torts which treat of "risk and duty:" MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696 (1916); Wagner v. International Railway Co., 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (1921); and Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928). He concludes the decision in Palsgraf " * * was a natural development of the theorem underlying the two preceding cases,"

and " * * * the fact that in Palsgraf judgment was given for defendant accentuates rather than throws doubts upon the underlying theorem of the three cases, *which is that risk not merely creates the extent of liability but defines its limits both with reference to persons injured and to harm."* (Emphasis supplied.)

In Palsgraf, supra, Justice Cardozo said:

"The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. Seavey, Negligence, Subjective or Objective, 41 H.L.Rv. 6.; Boronkay v. Robinson & Carpenter, 247 N.Y. 365, 160 N.E. 400. * * * 'It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.' Munsey v. Webb, 231 U.S. 150, 156, 34 S.Ct. 44, 45 (58 L.Ed. 162) * * *.

"Negligence, like risk, is thus a term of relation. * * * Negligence is not a tort unless it results in the commission of a wrong, and the commission of a wrong imports the violation of a right. * * *.

" * * * Affront to personality is still the keynote of the wrong. * * *." 248 N.Y. at 344, 345, 162 N.E. at 100, 101.[7]

---

6. "Q. Uh-huh. Well, now, whose responsibility was it under the contract in this case to provide for the safety of the contract employees?

A. This is the Coast Guard. They are not supposed to permit anybody on their property under these circumstances, whether it's a contractor employee, myself, you, the public.

Q. And why not?

A. Because the hazards are there, and they are not corrected—haven't been corrected." (Record, p. 155, testimony of Bisel.)

7. Bisel characterized the unguarded condition of the second deck of the lighthouse as an "outright risk," a certainty that anyone using the area on a day-to-day basis as plaintiff was, would sooner or later fall.

"A. You don't have a calculated risk here, you just have an outright risk.

Q. Outright what?

A. Outright risk. That if a man goes aboard that station, it's not a calculated risk that he is going to fall off, it's a positive fact that he's going to fall off if he messes around too much. *After you put your guardrails up, your toeboard, and after your ladder is properly repaired and the goosenecks, then you get into the calculated risk area. But up until this work is done, and this station is put in first class condition for the human being,*

Cardozo's test throws the problem into one of a relational duty of care owed to the plaintiff, and this duty springs from the possibility of an accident within clear view of the ordinarily prudent eye. Thus, foreseeability is an essential part of this doctrine.

One who possesses the knowledge, skill and ability to perceive and prevent injury to another and fails to act is liable. Bonin v. Gralewicz, 378 Mich. 521, 526, 146 N.W.2d 647, 649 (1966), cites Palsgraf on the issue of foreseeability of risk and duty.[8]

The United States was in a position to foresee harm to Gowdy. This created the relationship from which its duty of care to Gowdy arose. It owed a duty to Gowdy; it negligently breached that duty. It, therefore, is liable.

## OPINION ON DAMAGES

Defendant is liable for all injuries which are the natural consequences of the wrongful acts of the defendant, whether foreseen or unforeseen. Woodyard v. Barnett, 335 Mich. 352, 56 N.W.2d 214 (1953).

Clifford Gowdy is entitled to compensation which adequately and fully flows from the injuries he has sustained as a result of the defendant's negligence. Fair compensation is that which puts the plaintiff in as good a condition as he would have been if the injuries had not occurred. Anything short of this is inadequate. A person who causes an injury to another should not be allowed to cast any portion of the actual or appreciable loss on the party whom he has injured. Olsen v. City of Dearborn, 290 Mich. 651, 288 N.W. 295 (1939); Fisk v. Powell, 349 Mich. 604, 84 N.W.2d 736 (1937); In re State Highway Commissioner, 249 Mich. 530, 229 N.W. 500 (1930); Grand Rapids & Indiana R. Co. v. Heisel, 47 Mich. 393, 11 N.W. 212 (1882).

Clifford Gowdy is permanently injured. The plaintiff has established a reasonable degree of probability that future damages will occur. Kellom v. City of Ecorse, 329 Mich. 303, 45 N.W.2d 293 (1951); In re Boyer's Estate, 282 Mich. 552, 276 N.W. 552 (1937), approving Brininstool v. Michigan United Ry. Co., 157 Mich. 172, 121 N.W. 728 (1909).

These future damages are pain and suffering, impairment of earning capacity, and loss of physical power, vitality and capacity to enjoy the normal physical activities of life. Gilson v. Bronkhorst, 353 Mich. 148, 90 N.W.2d 701 (1958); Howell v. Lansing City Electric R. Co., 136 Mich. 432, 99 N.W. 406 (1904); De May v. Roberts, 46 Mich. 160, 9 N.W. 146 (1881).

Future damages are under Michigan law to be reduced to the present worth. Document No. 133 of "Desk Book," American Jurisprudence 2d, specifies the present value of a dollar per year for a number of years in the future. Plaintiff has introduced "Vital Statistics of the United States, 1963, Life Tables," Vol. 2 § 5, U.S. Dept. of Health, Education and Welfare, Table 5–1, p. 5–7. This document is judicially

---

*there's no calculated risk; it's just as sure, if somebody is exposed to this hazard frequently and too often, something is going to happen.*

Q. What is that sir?

A. Because that's the way our accident statistics are based, on the exposure. You can put an automobile at the curve fifty years and it will never hurt a soul. But you put that out in the street, expose it, well things start happening.

Q. Can you look at the structure shown on plaintiff's Ex. 36 and make that determination?

A. I should think you could. I could That's my business. I am a professional in that." (Record, pp. 155–6.) (Emphasis supplied.)

8. "In doubtful situations a jury must say where the line is to be drawn." Cardozo, J., in Bird v. St. Paul F. & M. Ins. Co. (1918), 224 N.Y. 47, 54, 120 N.E. 86, 88, 13 A.L.R. 875. Harper and James, Torts, § 18.8, p. 1058, 1059; Prosser, Torts (3rd ed.) § 52, pp. 329, 330.

noticed for all purposes in connection with future damages and life expectancy of the plaintiff. Gowdy was born June 13, 1924, and the table shows a life expectancy of 32.1 years.

Gowdy has been receiving disability payments from collateral sources, such as benefits under the Social Security Act, and the Michigan Workmen's Compensation Act. His medical and hospital expenses were paid by the insurance compensation carrier of his employer, Whittaker Electric Company.

Collateral source compensation does not operate to lessen the damages recoverable by an injured person from a wrongdoer. 15 Am.Jur., Damages, § 198; Lebel v. Swincicki, 354 Mich. 427, 93 N.W.2d 281 (1958); Kurta v. Probelske, 324 Mich. 179, 36 N.W.2d 889 (1949); Cawood v. Earl Paige & Co., 239 Mich. 485, 214 N.W. 402 (1927); Mazzolini v. County of Kalamazoo, 228 Mich. 59, 199 N.W. 648 (1924).

A wrongdoer takes the injured person as he finds him, and if his wrongful conduct results in aggravation of latent previous conditions of disability or pain, the defendant is liable for aggravation as well as that which originates from the injuries the plaintiff sustained.

Gowdy had a congenital anomaly of his lumbar spine which predisposed him to low back injury, and by reason of his psychiatric structure he was susceptible to grave emotional difficulties as a result of physical or mental stress. These were aggravated by his fall on August 23, 1963. Defendant is liable for the aggravation of these conditions. Royer v. Eskovitz, 358 Mich. 279, 100 N.W.2d 306, 2 A.L.R.2d 286 (1960); Beauerle v. Michigan Central R. Co., 152 Mich. 345, 116 N.W. 424 (1908); Hall v. City of Cadillac, 114 Mich. 99, 72 N.W. 33 (1897), increased susceptibility to pain; Schwingschlegl v. City of Monroe, 113 Mich. 683, 72 N.W. 7 (1897); Wilkinson v. Detroit Steel & Spring Works, 73 Mich. 405, 41 N.W. 490 (1889).

## FINDINGS OF FACT AND LAW ON SPECIFIC ELEMENTS OF DAMAGE

*Medical Expenses*

Gowdy is entitled to compensation for all of the reasonable medical expenses which were incurred for proper examination, diagnosis or treatment of the injuries sustained by him, or for relief of pain and discomfort resulting from his injuries. Abbott v. City of Detroit, 150 Mich. 245, 113 N.W. 1121 (1907); Sherwood v. Chicago & W. M. Railway Co., 82 Mich. 374, 46 N.W. 773 (1890), approving Power v. Harlow, 57 Mich. 107, 23 N.W. 606; Geveke v. Grand Rap. & Ind. R. Co., 57 Mich. 589, 24 N.W. 675 (1885).

Defendant has admitted that plaintiff's medical expenses set forth in plaintiff's exhibits 19–32(e) are fair and reasonable. A summary of these damages follows:

Medical expenses:

| | |
|---|---|
| Hackley Hospital | $1,010.06 |
| Drs. Holly, Joistad, et al. | 45.00 |
| Dr. D. H. Giese | 275.00 |
| Dr. E. J. Lauretti | 254.00 |
| Dr. John C. Farmer | 10.00 |
| Drs. Askam, Smith, et al. | 40.00 |
| Drs. G. T. Aitken, et al. | 75.94 |
| Anne Spoelman, anesthetist | 40.00 |
| Dr. M. P. Krenz | 12.00 |

Other medical expenses:

| | | |
|---|---|---|
| 6 "Blue Bill" statements for shoes and wedges | $106.79 | |
| Tate-Weaver Ambulance Service | 40.00 | |
| Hammer Drug Store | 16.33 | |
| Balbirnie-Apostle Mortuary Ambulance Service | 72.00 | |
| 5 "Blue Bills," expense of transporting Gowdy from Mears to Muskegon, Michigan for medical care and treatment | 288.62 | |
| TOTAL | | $2,285.74 |

Additional medical expenses in connection with severe back complaint: 9-65-11-66, inpatient care Plainwell Sanitarium:

| | | |
|---|---|---|
| Oceana Hospital | $170.85 | |
| Dr. Edwin Williamson | 150.00 | |
| Plainwell Sanitarium | 234.00 | |
| TOTAL | | $554.85 |

Dr. Robert Jarka recommended a triple arthrodesis to the left foot to relieve severe pain and discomfort. We

find a total of $1,000 represents a reasonable adjustment for estimated surgical fees of $200–$225, and a hospitalization period followed by physiotherapy.

*Physical and mental pain and suffering*

Plaintiff is entitled to recover damages for past and future pain and suffering. Howell v. Lansing City Electric R. Co., supra; Brown v. Oestman, 362 Mich. 614, 107 N.W.2d 837 (1961).

In addition to physical pain and suffering, plaintiff is entitled to compensation for mental pain or discomforts, which includes anxiety, suspense and fright resulting from the injuries he sustained, as well as personal anguish or mental distress he experienced or will experience because of his multiple disabilities. Sherwood v. Chicago & W. M. Railway Co., supra; Abbott v. City of Detroit, supra.

For the first two years, from August 23, 1963 to August 23, 1965, a period of 104 weeks, plaintiff endured great pain and discomfort. This is substantiated by the testimony of his physicians. During this period his pain was acute except for occasional remissive stages of less intense pain. An os calcis injury of the character incurred by the plaintiff is accompanied with a persistence of pain and complaints, even though medically satisfactory mechanical results may be achieved through orthopedic treatment.

Gowdy experiences some degree of pain during all of his waking hours, which is intensified with increased physical activities such as walking, standing or any variation in gait or movement.

The medical testimony establishes a real probability of a continuance of this pain and suffering into the future. His injuries and pain and suffering in this respect are permanent.

Dr. Emil J. Lauretti, a physician and surgeon who has practiced traumatic and industrial surgery and medicine since 1934, observed that in cases involving fractured heels, patients usually do have many complaints and most of them complain of severe pain. He said: "* * * anybody that has fractured heels have a bad disability. * * * As I say when you have two heel bones fractured, it's *really a terrible disability.*" (Deposition of Dr. Lauretti, pp. 44–5.) (Emphasis supplied.)

Dr. Giese, a specialist in orthopedic surgery, concluded "* * * there will probably be very little improvement as far as pain is concerned, that in all probability he will continue to have substantial amounts of discomfort in both feet." (Deposition of Dr. Giese, p. 42.)

Plaintiff should be awarded $130 per week for the first two years of the period of his injuries. He is entitled to receive $100 per week for 70 weeks, August 23, 1965 to December 22, 1966, date of trial.

We evaluate his future pain and suffering for the period of his 32.1 years of life expectancy at $3,120 per year. We reduce this to its present worth by multiplying $3,120 per year by 15.803, the 5% discount factor.

*Loss of physical power, vitality and enjoyment of life*

One who sustains an injury as a result of the wrongful conduct of a tortfeasor is entitled to compensation for loss of physical power, vitality and enjoyment of life.

As Justice Sharpe said in Cawood v. Earl Paige & Co., supra, at 490, 214 N.W. at 404:

"He will no longer be permitted to enjoy many of the things in life which it may well be said 'make life worth living.' He will always be crippled, and must suffer the inconvenience and humiliation incident to such physical condition."

Plaintiff was truly a family man. His activities centered around his employment and his family circle. His social and recreational activities revolved around his wife, Mary Jo, and their children. These activities included dancing, ice skating, walking through the nearby woods or the Lake Michigan shore, family picnics, mushroom hunting, and shopping. Plaintiff enjoyed solitary

walks through the woods and along the Lake shore. He spent considerable time reading. His crippled condition has dislocated the family circle and terminated these highly desirable and happy pursuits. Increased emotional distress has disrupted family harmony.

The testimony, professional and that of friends and neighbors, substantiates the conclusion that Gowdy has lost spirit and that his physical power and vitality are severely curtailed. He is entitled to recover damages for this substantial loss and impairment.

The testimony supports an award in the sum of $60 per week for the period from the date of his injury to the date of trial, 174 weeks.

Plaintiff's impairment is permanent. His future award for loss of the capacity to enjoy life, physical power and vitality is measured at $25 per week ($1,300 a year) for the period of his life expectancy (32.1 years) reduced to its present value by application of the 5% discount factor of 15.803.

*Impaired earning capacity*

Before August 23, 1963, plaintiff possessed a capability of performing a full range of physical activities in his employment, which required considerable walking, climbing, standing, lifting and carrying of heavy items. All those activities incident to his work as a journeyman electrician he was able to perform with ease. His injuries caused an outright destruction of his ability to work

as a journeyman electrician. His disability is total; he cannot resume his former employment or any work which requires a broad scope of physical activities for which he was previously qualified and able to accomplish. Medical testimony establishes a modicum of residuum employability within a restricted and circumscribed area of physical activity, but plaintiff's opportunities for re-employment in the electrical field are minimal, if not in fact non-existent.[1]

In the light of the evidence, we are compelled to the judgment that his injuries are total and permanent. This judgment is likewise that of the Social Security Administration.

Averaging plaintiff's annual earnings during the five years preceding his injuries, we find plaintiff's minimum annual wage then was $6,707.28.

Plaintiff's expert, Professor John P. Henderson, of the faculty of Michigan State University, used this annual minimum earning level in computing plaintiff's past and future impairment of earning capacity. This figure is considerably less than the actual average weekly earnings of Gowdy at the time of his injuries. His immediate pre-injury average weekly wage was $168.50, which is a justifiable basis for computation of the impairment of his earning capacity.

Were we to use the $168.50 figure, the ultimate result would be approximately 20% greater than the amounts computed

[1]. Dr. Robert W. Jarka, an orthopedic surgeon, concluded as of February 18, 1966, that Gowdy was unemployable.

Dr. Lauretti stated:

"In the first place, he might get rid of the greater part of his pain, but I don't think he would ever get rid of all of it; and as far as any unrestricted work, I think this man is disabled from doing certain types of work. * * * The only type of work he would be able to return to would be to work on level ground. As long as the material that he is walking on—be it ground or cement or anything, as long as it is level —he would have less trouble, but he would still have pain. Whether or not he could put in a full eight-hour day,

even working on level ground, I can't say. I think that he would still have some pain.

"As far as climbing ladders or poles, or even walking on, say, narrow planks, where he could easily lose his balance and fall, I don't think he could do that.

"Q. What about walking on rough or uneven ground or surfaces?

"A. No, no. He would have trouble." (Deposition of Dr. Lauretti, pp. 25, 26.)

Dr. Giese also concurred in Dr. Lauretti's judgment that Gowdy would never be able to return to his former occupation as an electrical lineman or engage in any work requiring prolonged standing.

by Professor Henderson in his testimony.

The prevailing union rate for journeymen electricians in the Western Michigan area is set forth in the testimony, and the prevailing weekly wage for the standard 40-hour work week on the date of the plaintiff's injuries to this date, including fringe benefits, ranges from $164.43 during August of 1963, to $202.88 in June of 1966.

Therefore, when we accept as an annual earning level the $6,707.28 figure used by Professor Henderson, we fix this annual rate on the conservative side of the ledger. It is the minimum established by plaintiff.

■ Under Michigan law Gowdy should be fully compensated for any loss or reduction in his earning capacity. Canning v. Hannaford, 373 Mich. 41, 127 N.W.2d 851 (1964); Prince v. Lott, 369 Mich. 606, 120 N.W.2d 780 (1963); Routsaw v. McClain, 365 Mich. 167, 112 N.W.2d 123 (1961); Harris v. Wiener, 362 Mich. 656, 107 N.W.2d 789 (1961); Lorenz v. Sowle, 360 Mich. 550, 104 N.W. 2d 347, 81 A.L.R.2d 728 (1960); Miller v. Pillow, 337 Mich. 262, 59 N.W.2d 283 (1953).

As Justice Dethmers said in Prince v. Lott, supra, at 610, 120 N.W.2d at 782:

" * * * the factor to be considered in determining such damages is not what plaintiff would have but what he could have earned but for the injury. It is the loss of earning capacity for which damages are to be awarded. Norris v. Elmdale Elevator Co., 216 Mich. 548, 185 N.W. 696; Miller v. Pillow, 337 Mich. 262, 59 N.W.2d 283; Harris v. Wiener, 362 Mich. 656, 107 N.W.2d 789."

We have considered that plaintiff has received earnings from other employment since his injury and has worked as a substitute rural mailman. The Michigan Supreme Court has adopted the rule that "impairment of earning capacity is not equated with wage loss."

■ Conceivably, plaintiff's post-injury income could exceed earnings received from pre-injury employment, This, however, is not the norm of measurement. Plaintiff is entitled to compensation for the entire amount of the established pre-injury earning capacity, so long as there is a continuation to the impairment of that earning capacity. His post-injury employment is insufficient to establish a revived earning capacity when weighed against his established wage earnings capacity as a journeyman electrician.

Impaired earning capacity from the date of the accident to July 12, 1967 is $26,053.96. We here use the annual minimum earning level of $6,707.28.

Professor Henderson based plaintiff's life expectancy upon Table "A" of "The Length of Working Life for Males, 1900-1960" U. S. Dept. of Labor Manpower Report (No. 8), July 1963, as standing at 21.667 years from the date of the trial, December 22, 1966. Because it is approximately six and a half months since the date of the trial, we use a flat twenty-one years as his work life expectancy in computing plaintiff's future impairment to his earning capacity. Again, using the minimum annual income level of $6,707.28 for a period of twenty-one years, this results in a total of $140,852.88.

Under Michigan law, future damages should be reduced to present worth. Professor Henderson testified that according to information obtained from the Bureau of Labor Statistics of the U. S. Department of Labor, future wages are reasonably expected to increase at the rate of 5% per annum. This balances out the 5% formula for reduction of future damages to present worth. Future wage increases that would reasonably be expected by Gowdy would be equal to the adjustment of his future damages to present worth.

Professor Henderson included in his analysis on impairment of future earning capacity loss of fringe benefits which plaintiff would sustain by virtue of his disability. This is a proper element of damages.

Professor Henderson's computations are reasonable, and therefore, adopted by this court. His testimony establishes a total loss of fringe benefits from the date of the accident, computed on plaintiff's life expectancy, as 10.6% of gross earnings. Therefore, 10.6% of $166,906.84 is $17,692.13.

Plaintiff's damages are summarized as follows:

Pain and suffering:

| | | |
|---|---:|---:|
| Two years (from date of injury to 8–23–65) at $130 per week | $13,520.00 | |
| Seventy weeks (from 8–23–65 to the date of trial) at $100 per week | 7,000.00 | |
| Future — $3,120 x 15.803 | 49,305.36 | $ 69,825.36 |

Loss of physical power, vitality and enjoyment of life:

| | | |
|---|---:|---:|
| $60 per week for 174 weeks | $10,440.00 | |
| $1,300 x 15.803 | 20,543.90 | 30,983.90 |

Impaired earning capacity:

| | | |
|---|---:|---:|
| $6,707.28 per year from date of accident, 8–23–63, to July 12, 1967 (202 weeks) | 26,053.96 | |
| $6,707.28 for 21 years | 140,852.88 | 166,906.84 |
| 10.6% fringe benefits | 17,692.13 | 17,692.13 |
| | | $285,408.23 |
| Medical expenses $2,285.74 554.85 | 2,840.59 | |
| Future | 1,000.00 | 3,840.59 |
| | | $289,248.82 |