**Frederick DRAISMA and Wilma Draisma, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 78-441.**

United States District Court, W. D. Michigan, S. D.

June 23, 1980.

Henry L. Guikema, Murray, Mroz & Guikema, Grand Rapids, Mich., for plaintiffs.

Thaddeus B. Hodgdon, Trial Atty., Torts Branch, U. S. Dept. of Justice, Washington, D. C., for defendant.

OPINION

ENSLEN, District Judge.

This is an action brought under the Federal Tort Claims Act (FTCA) 28 U.S.C. § 2671, et seq. as authorized by the National Swine Flu Immunization Act of 1976, 42 U.S.C. § 247b(k)(1). Plaintiffs filed their Complaint on June 20, 1978 after complying with the administrative claims procedure required by the FTCA. Shortly thereafter the action was transferred to the District of Columbia for coordinated pretrial proceedings under the guidance of Judge Gesell. At the close of 1979, after his final pretrial order, Judge Gesell remanded the case to this Court for further proceeding. The parties met for a Pretrial Conference on March 12 of this year and trial was held April 28–30.

As a result of the United States Admissions filed on March 11, 1980, which acknowledged that the swine flu vaccination caused FREDERICK DRAISMA to contract the Guillain-Barre Syndrome (GBS), and that the government was liable for the proximate injuries flowing therefrom, the only remaining issue was that of damages. The following is a brief history of Plaintiff's injury for which the Court must assess damages:

On November 17, 1976 Frederick Draisma was inoculated with a swine flu vaccination in Wyoming, Michigan, administered by participants of the National Swine Flu Immunization Program. The first symptoms of the Guillain-Barre Syndrome appeared on December 5 of the same year. The symptoms which initially consisted of a tingling sensation in the extremities did not abate, but progressed to tactile impairment, loss of control of limbs, and stiffness and pain in the extremities and torso which necessitated hospitalization on December 12. Plaintiff's condition continued to deteriorate and culminated in general paralysis requiring transfer on December 21 to the intensive care unit where his vital signs would be constantly monitored and respiratory aids would be available if needed. During the following couple of weeks his illness peaked and then began to subside enabling his transfer out of intensive care on December 31, and discharge from Butterworth Hospital on January 11, 1977.

Plaintiff was then admitted to Mary Free Bed Hospital where he stayed and underwent rehabilitative physical therapy until April 8, 1977. When he left Mary Free Bed he still required a walker in order to ambulate and was not able to return to his work as a carpenter on a part time basis until July 22, 1977. Even then he was still required to perform rehabilitative exercises at home. To this date he has been unable to return to general carpentry duties which require heavy lifting or other strenuous exertion, but he has managed to work full time as a "finish" carpenter since December 1977.

The above capsule of Frederick Draisma's illness and residual deficits contains the outline of many elements of his damages claim and also point to the basis of his wife, Wilma Draisma's claim for loss of consortium. The following will delineate the Court's particular findings of fact and conclusions of law.

*Medical Expenses*

The Plaintiff is entitled to compensation for all of the reasonable medical expenses resulting from GBS. *Schulte v. Holliday,* 54 Mich. 73, 19 N.W. 752 (1884), *Gowdy v. United States,* 271 F.Supp. 733, 749 (D.C.1967).

Defendant has not contested either the liability for, or the reasonableness of the Plaintiff's medical expenses set forth in Exhibits J and K. The summary of these damages set forth in Exhibit J reflects a total of $20,976 for which the Defendant is liable.

*Past Pain and Suffering—Intangible Injuries*

The Plaintiff argues that he is entitled to damages for intangible injuries which he breaks down into the following physical and emotional components: physical pain; fear of his own death and anxiety over the uncertainty of recovery; loss of enjoyment of life; and inconvenience, humiliation and embarrassment. The Defendant, again, has not contested its liability for this general element of damages-pain and suffering—but is merely differing in the amount which it believes will fairly compensate.

The Plaintiff's position regarding the various components of intangible injuries which are compensable is supported by long established Michigan case law. In 1890 the Supreme Court of Michigan upheld the following instruction:

> The elements of damages which the jury are to take into account consist of all effects of the injury complained of, consisting of personal inconvenience, the sickness which the plaintiff endured, the loss of time, all bodily and mental suffering, impairment of capacity to earn money, the pecuniary expenses, the disfigurement or permanent annoyance which is liable to be caused by the deformity resulting from the injury; and in considering what would be a just sum in compensation for the suffering or injury the jury are not only at liberty to consider the bodily pain, but mental suffering, anxiety, suspense and fright which may be treated as elements of the injury . . *Sherwood v. Railroad Company,* 82 Mich. 374, 46 N.W. 773 (1890). See also *Gowdy*

v. *United States*, 271 F.Supp. 733, 750 (D.C.1967).

To answer the question of "how much", the Court, as the fact finder, must examine the circumstances surrounding Mr. Draisma's hospitalization and subsequent recovery. Shortly after Plaintiff received the swine flu inoculation he noticed tingling, numbness and weakness in his toes and fingers. As is typical with GBS, these nervous disorders progressed inward. In his worst state, he could not move his feet or hands, could not feed himself, had difficulty swallowing, and was told to concentrate on breathing so that he would not have to be put on a respirator. During this time he was placed in intensive care and Plaintiff testified to being seriously concerned about his survival.

After the paralysis began to subside, Plaintiff was released from the general hospital and placed in Mary Free Bed Hospital, where he underwent physical therapy. Initially, he had severe pain throughout his back when he attempted to sit up. He was encouraged, however, to do as much for himself as possible. Eventually he could get into a wheelchair and feed himself. Throughout this period his physical therapist encouraged him to stretch his muscles to prevent stiffening and atrophy. Mr. Draisma's compliance with this program and constant striving to get his body back in shape for normal life was credited for his quick recovery. In order to be fairly compensated for the intangible injuries Mr. Draisma incurred during his hospitalization from December 12, 1976 to April 8, 1977 the Court has determined he should be awarded $150 per day.

Once Mr. Draisma returned home his life did not immediately return to normal. In order to re-enter his home his family placed a plank from the car to his steps, and he crawled in. When on level ground, he progressed from using a walker to a cane; and by July 1977, he was able to walk independently. Throughout this period he continued an exercise program to build up the muscles that were weakened during the inactivity caused by his illness. Initially, he received some professional help in this area as an out-patient of Mary Free Bed. For the intangible injuries suffered by Mr. Draisma during his home recuperation until he returned to work on July 22, 1977, he should be awarded $75 per day in damages.

In late July Mr. Draisma was able to return to work in a part time capacity. He was not, however, able to resume his full responsibilities as a general carpenter. Having done his exercises faithfully at home he expected to be able to perform his old activities at a satisfactory level. His daughter attested to his discouragement after his first day at work when he came home and cried because of his diminished capacity. Even the most rudimentary carpentry tasks, involving the use of a hammer, were no longer second nature, but were a constant effort requiring all his strength and perseverance. Although his family thought it was too early to return to work, and he was still required to do special stretching and strengthening exercises, he felt he had to work as much as possible since all their savings had been drained and they had already received as much help from friends and neighbors as he (as a proud, formerly self-sufficient family man) could accept. When he was able to resume working full days, he found that he required much more rest than before. Rather than taking a quick break at noon for lunch, Mr. Draisma has had to lay down and rest during his lunch hour, and during his morning and afternoon breaks. Then when he returned home in the evening he was exhausted, without the energy required to perform simple household tasks like mowing the yard, or other general home maintenance, which he was accustomed to performing.

His recreational pursuits have also been limited. He can no longer hunt or perform other such activities which require much exertion. When his wife goes shopping, he will find a place where he can sit until she is ready to go home. Although he still bowls on a weekly basis, it leaves him in considerable pain that following night.

To adequately compensate Mr. Draisma for the pain and suffering and other intangible injuries from the time he went back to work until the time of the trial (April 30, 1980) he should receive $8,000 per year.

*Past Loss of Consortium*

Under Michigan law the Defendant is liable for loss of consortium to the injured party's spouse caused by its tortious conduct. This element of damages is explained in a recent Michigan Supreme Court case:

> Loss of consortium technically means the loss of conjugal fellowship. However it is legally recognized as including loss of society, companionship, service and all other incidents of the marriage relationship. (Cites omitted) *Washington v. Jones,* 386 Mich. 466, 472, 192 N.W.2d 234, 237 (1971)

Mrs. Draisma's loss in this area was not complete since her husband survived his illness. During the period of his hospitalization, she was, however, nearly totally deprived of her husband's aid and society. There was testimony that Mrs. Draisma was very reliant on her husband for many daily decisions, especially those involving child rearing and finances. Such dependence on her husband for guidance, and the emotional distress the absence of such assistance caused, was verified by a social worker at Mary Free Bed. For the period of her husband's hospitalization Mrs. Draisma should receive $100 per day in damages.

Once he returned home, her husband was still not able to be the source of strength and guidance that he had before. All the incidents of the marriage relationship were still largely affected and Mrs. Draisma is entitled to substantial compensation for the period of her husband's home recuperation in the amount of $50 per day.

Upon returning to work, Mr. Draisma was able to resume his former position as the head of this household. The relatively healthier and stronger Mr. Draisma was able, once again, to provide the companionship and aid that his wife had been accustomed to. His recovery was, however, less than complete.* Whereas formerly he was able to perform many household chores on his own, he now required the assistance of his wife. Now she is needed in order to finish mowing the lawn and other such activities which prove to be too strenuous for Mr. Draisma when he comes home from work, drained of all his energy. Additionally, Mrs. Draisma has a less energetic recreational partner. For example, when she goes to a mall to shop, her husband must sit and wait for her to finish. Although she regained much of the conjugal fellowship—as understood in its larger sense—Mrs. Draisma still suffered from a slight loss of consortium (a fact that the government does not contest) and she should be awarded $1,000 per year in damages from the time her husband went back to work until the time of the trial.

*Loss of Mr. Draisma's Earning Capacity*

When Frederick Draisma returned to his former job in July of 1977 on a part time basis, he discovered that, not only was he initially limited to part time work, but that he could not perform the same general carpentry duties. Whereas, he formerly could carry heavy ladders, lumber and shingles, he was limited to lighter finish carpentry, which involves hanging doors, and installing cabinets and placing trim. His employer, J & F Builders had not been doing the finish work before the Plaintiff's bout with GBS, but afterwards included the finish work in its contract so as to provide the Plaintiff with employment.

According to Michigan law a Plaintiff is entitled to recover from a tortfeasor damages for impairment in earning capacity caused by the tort. This broad area of damages is typically bifurcated into loss of time and decreased earning capacity with the time of trial dividing the two. Both are

* . . . Tho' much is taken, much abides; and tho'
We are not now that strength which in old days
Moved earth and heaven; that which we are, we are; . . ."
Tennyson; *Ulysses*

concerned with the amount the Plaintiff was capable of earning before and after the injury, rather than the amount Plaintiff actually earned before and after the tortious act. A distinction is made between the two, however, because decreased earning capacity alone requires a calculated estimation as to impairment of the ability to earn in the future. (See generally 22 Am. Jur.2d: Damages § 89)

*A. Past Earning Capacity*

Since no evidence was presented that Mr. Draisma was working below his maximum earning capacity before the time of acquiring GBS, the Court must assume that his employment compensation in 1976 represented his maximum earning capacity. Therefore he is simply entitled to his actual wage loss during the time he was incapacitated or recuperating from his illness. During the period from December 12, 1976 to July 22, 1977 Mr. Draisma lost $11,249 in actual wages.

Mr. Draisma also seeks damages for loss of non-market services without citing any applicable Michigan law. The Court could not find any authoritative Michigan guidance on this point. If Mr. Draisma were required to pay someone else to perform what he would normally have done, this would have been recoverable as an expense attributable to the injury. There has been no such showing. (The only related evidence being that certain maintenance projects have been left undone, or another family member performed the task.) A certain portion of these non-market services may be recoverable by Mrs. Draisma as loss of services in her consortium action, or by Mr. Draisma as loss of enjoyment and vitality-intangibles which have been discussed. Other than these aspects, one's own non-market services would seem to be unrecoverable.

Mr. Draisma also seeks damages for decrease of earning capacity for the period from July 22, 1977 to April 30, 1980 (the time of trial). During this period, the Plaintiff was employed as a finish carpenter and was earning the same wages as before his injury, when inflation is taken into account. The Defendant simplistically argues that the fact of equal earnings rebuts the argument of reduced earning capacity with respect to both the past and the future. Although the Court rejects the Defendant's reasoning, it concurs with its position, at least with respect to past earning capacity.

The fact that actual earnings do not diminish is not dispositive of the issue of impairment of earning capacity. The Plaintiff may have been working below his reasonable maximum earning capacity before the injury occurred. See *Lorenz v. Sowle*, 360 Mich. 550, 104 N.W.2d 347 (1960). On the other hand, the Plaintiff may be receiving more than he is actually worth after the accident because of his particular employment contract; e. g. gratuitous payments. See *Canning v. Hannaford*, 373 Mich. 41, 127 N.W.2d 851 (1964). As discussed above, the Plaintiff presented no substantial evidence that his earning capacity was greater than his pre-injury earnings. Although the presentation of testimony made apparent the fact that his employer made special efforts to obtain finish work so that they would keep the Plaintiff employed, there was no proof that he was being paid for work he did not do. Therefore, neither of the exceptional circumstances apply which would enable the Plaintiff to recover for "lost time" more than his lost wages.

*B. Future Earning Capacity*

The issues with respect to the future is more complicated since one cannot abstractly determine what actual future earnings will be. By the very nature of the second element of impaired earning capacity there is some measure of speculation or uncertainty. The Defendant claims that when such uncertainty amounts to the Plaintiff being unable to prove his damages by a preponderance that he is precluded from recovery. Once again the issue proves to be more involved, but here, however, the Court sees the Defendant's position as being erroneous.

There are three aspects to decreased future earning capacity in this case. First, there is the contested prediction that Mr. Draisma will be forced to retire from his work as a finish carpenter solely from GBS residuals of fatigue and enervation within 5–7–10 years. Second is the uncontradicted prediction that Mr. Draisma will be unable to work after he is forced to undergo dialysis due to his polycystic kidney disease (an ailment unrelated to the GBS and injuries caused by the Defendant) because of the cumulative drain the dialysis and the GBS residuals will have upon his system—although a man with his determination may have been able to work after dialysis if he had no other limiting condition. The third argument is that he is already under an inchoate type of incapacity since he can no longer perform general carpentry duties and if/when he is forced to seek other employment, his employment opportunities will be limited.

The Defendant, believing it has rebutted the third argument by showing equal actual earnings, focuses its legal argument upon the first and second forms of impairment. It argues that Dr. Parson's testimony relating to an early forced retirement solely due to GBS residuals must be discredited because of inconsistencies ** and its own witness who testified that Plaintiff could continue working until normal retirement should be believed. Believing that it has rebutted this first form of possible impairment the Defendant next reasons that the only form of impairment left is also inapplicable because of the uncertainty involved. The Defendant points to the fact that the evidence has shown that Plaintiff may be forced to undergo dialysis in either 5 or 15 years, with each being equally probable. Defendant argues it is the responsibility of the Plaintiff to establish his damages by a preponderance, and that the Plaintiff has only established that it is more probable than not that he will undergo dialysis within 15 years—by which time Plaintiff will have reached the age of normal retirement. (Defendant's other reasoning which urges the Court to require that GBS be found to be the predominate cause of retirement before liability exists, ignores the generally accepted "eggshell skull/plaintiff doctrine", and is only applicable to concurrent rather than pre-existing conditions.)

Plaintiff acknowledges that the *fact* of injury must be established by preponderance—more probable than not—but argues that there is a lesser standard for establishing the *extent* of damages. See *Howard v. City of Melvindale*, 27 Mich.App. 227, 235, 183 N.W.2d 341, 345–6 (1970). Once this is accepted, the issue becomes whether the "fact" of damage has been established; and what form of "damage" one is concerned with in this context. In his briefs the Plaintiff seems to assume that because he can establish some injury; e. g. medical expenses, pain and suffering and lost time (wage loss) that he has established the "fact" of injury—thereby meeting his burden and forcing the Defendant to bear the uncertainty as to the extent of actual future damages.

■ This reasoning, if accepted, would seem to allow an unmanageable and intolerable amount of speculation in the realm of damages. Since every Plaintiff, who can establish liability, can presumably demonstrate at least minimal damages; does it also mean that every Plaintiff should be entitled to recover for decreased earning capacity, although he cannot shoulder the burden of proving their existence by a preponderance? Nearly the same objection can be raised if proof of any *future* damages would reduce the standard of proof with respect to future earning capacity. Plaintiff's far reaching argument need not be reached however, since the Plaintiff has been able to demonstrate that it is more probable than not that he will suffer some degree of future reduction in earning capacity. Once he has established this, the

** During deposition Dr. Parsons testified that Plaintiff would be forced to retire within 7–10 years. On direct examination he stated that this would occur within 5–7 years. Defendant has argued that this inconsistency bears on his credibility, while the witness affirmed that this general range of 5–10 years was accurate.

Defendant must bear a greater burden with uncertainty as to the "extent" of injury which he has caused.

The fact of future reduced earning capacity was evidenced by the Plaintiff's future inability to perform as a general carpenter. Rather than work in a general capacity as he had in the past he is now limited to lighter, finish jobs.

That a limitation in job function is compensable in Michigan was affirmed by *Abbot v. City of Detroit*, 150 Mich. 245, 113 N.W. 1121 (1907) where the court stated:

> It was also undisputed that this injury was a serious one and would be permanent; that before the injury she was healthy and strong, now she is not able to walk to and from her work and must do work where she can sit all day with her right foot resting upon a block. This plaintiff is, and will be, confined to only such employment as will offer her these conditions. Before her injury she could seek employment of any and all kinds. It is apparent that her earning capacity as a working girl is impaired by reason of this injury.

Such impairment is compensable in the future even if the Plaintiff is earning more at his present job than he was before his injury. The case most clearly demonstrating this holding and the reasoning behind it is *Norris v. Elmdale Elevator Company*, 216 Mich. 548, 185 N.W. 696 (1931), where a carpenter had the bones in his right wrist broken and was unable to resume his former employment as a carpenter, which paid $5 per day, and was forced to seek new employment, finding a position with the railroad as a signal man (and eventually assistant foreman) which paid greater wages than carpentry ($.68-.85/hr.). After Plaintiff's own submission of testimony that his carpentry ability was reduced by 50 percent, the Court awarded damages for future impairment in earning capacity.

It is true that in *Norris, supra*, the Plaintiff was laid off a week before the trial because of labor conditions, but rather than this limiting the holding of the Court, it serves to highlight the true nature of the injury. By having one less trade at his disposal the injured Plaintiff has a reduction in future employability. If the business conditions in a particular industry are such that he is forced to seek alternative employment, he can no longer switch to another field in which he has some expertise and therefore retain a competitive edge over other prospective applicants. The injury is therefore best characterized—when one has another job at present, but is to some degree foreclosed from another vocation by the tortfeasors conduct—as increased probability of unemployment.

In the case at bar, the government, after hearing the above reasoning, would probably argue that the Plaintiff is still in the same field—the construction business and that he should not be compensated merely because this industry is currently suffering from the recession. It is correct that Plaintiff is currently employed by the same type of contractor that he was prior to his GBS, and that he performs skills that are within the same production line—although they are now concentrated nearer the end product.

The difference between his former and present/future positions must, however, be analyzed functionally. For the purposes of this discussion the critical issue is employability or job stability. Although there was testimony that Plaintiff has proven to be a very skilled finish carpenter, there was further evidence that he would, nevertheless, have a better chance of getting hired by another employer if he were able to, additionally, perform the heavier carpentry tasks. (Common sense and a limited familiarity with the construction industry also lead to this conclusion, particularly when one considers the cyclical nature of this business. During the trial the Plaintiff's current employer testified that he had only six weeks of work left on his last major project. It was in this apartment complex

that the Plaintiff had found work as a finish carpenter. When this job is completed the next job on which his bid is accepted will most likely involve the initial stage of construction which encompass predominately heavy carpentry. As the Plaintiff has remained one of the last working (as the jobs were finished), so he will also be one of the last to be reemployed once construction picks up.)

The question of the degree of decreased earning capacity is a difficult factual inquiry, which a jury has the benefit of not having to reduce to a particular formula to justify its conclusion. The Court, not being afforded such luxury, must delineate its findings. Since the critical factor is related to the risk of unemployment, the issue could be reduced to an equation considering this factor as follows:

| | | | | |
|---|---|---|---|---|
| Ability to earn (average of two jobs) $20,000 | x | probability of being employed at either of two jobs 90% | = | former risk reduced earning capacity $18,000 |
| Ability to earn at present job $20,000 | x | probability of being employed at this job 65% | = | future risk reduced earning capacity $13,000 |

The difference between the former and future risk reduced earning capacity would be the reduction in earning capacity—$5,000. Of course, there was no direct evidence as to percent probability of unemployment, and the use of such figures could be misconstrued and detract from the realization that, at best, this is an approximation of future damages which are inherently speculative to some degree. The formula, however, should at least point to the consideration that places the damages figure at more than a projected decrease in salary or hourly wages; and less than the absolute income that will be lost by not pursuing one job, disregarding the fact that he may pursue another.

Since this state of diminished energy and strength has been shown to be permanent, the Plaintiff would be entitled to damages for decreased earning capacity from the present to his normal retirement age. (Plaintiff has only argued for damages until age 65, so the Court need not consider if he should be entitled to compensation for years within his estimated life span beyond that point). One factor enters in, however, to change the Plaintiff's projected earning capacity. As indicated earlier there were three components to the Plaintiff's decreased earning capacity claim and as of this point only the third type has been discussed.

Since the Plaintiff has already established the fact of diminished future earning capacity, the Defendant's argument as to uncertainty of damages for this injury has been debilitated. After considering the testimony that the Plaintiff will be forced to undergo dialysis in 5 or 15 years together with somewhat equivocal testimony of the Plaintiff's rehabilitative expert that the Plaintiff will become unemployed solely due to GBS in 5–7–10 years (as opposed to the Defendant's neurologist that he could continue to do finish carpentry until 65, in the absence of dialysis); the Court finds that the Plaintiff's earning capacity will be reduced by one-half 7 years from the date of trial. The Court concludes that within 7 years from the date of trial the Plaintiff will undergo dialysis, and after that time the Plaintiff would, in the absence of incurring GBS, be able to work only part time—20 hours per week. After dialysis, when suffering from the GBS residuals, he will not be able to work at all. This is consistent with the parallel finding that he would not become unemployed solely because of GBS residuals, but this factor would enter into making the Plaintiff unable to work at all after dialysis.

1. *Federal Taxes*

The Defendant argues that, in the event the Plaintiff is awarded damages for a decrease in earning capacity, such amount should be reduced by the proportion the Plaintiff would normally have paid in federal, state and local income taxes. The Defendant acknowledges that the proper measure of damages must be determined by Michigan law under the Federal Tort Claims Act, and that Michigan courts have not taken an express position on this issue. Defendant urges the Court to rule that the damages must be reduced, as a matter of federal law, since any award above "net income" would be a punitive award which is prohibited by the FTCA.

This Court agrees with Defendant that Michigan cases have not made express their position on the tax issue, but would note in passing that the act of declining to resolve this issue, and thereby not deducting for taxes constitutes sub silentio approval of the majority position which ignores the effect of taxation. The Court would also note that the recent Supreme Court decision in *Norfolk and Western Railway v. Lepielt*, —— U.S. ——, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), which required a deduction in the award for the amount of federal income taxes that would be paid if the money were earned in the normal course of employment (although replete in sound reasoning rebutting most of the arguments for not reducing for taxes) was a Federal Employer's Liability Act case in which damages is a federal question—and is not controlling where damages is a state question.

The Sixth Circuit addressed the issue of "punitive damages" in the FTCA context in *Kalavity v. United States*, 584 F.2d 809 (1979). In that case, the Court declined to accept the definition of punitive adopted by the 1st and 9th Circuits which included anything above compensation and instead distinguished ordinary tort damages from punitive damages. The *Kalavity* court concluded that:

> In excluding 'punitive' damages from the coverage of the Tort Claims Act, we believe that Congress simply prohibited use of retributive theory of punishment against the government, not a theory of damages which would exclude all customary damages awarded under traditional tort law principles which mix theories of compensation and deterrence together. At 811.

The court then went on to distinguish *Felder v. United States*, 543 F.2d 657 (C.A. 9 1976) which held that awarding gross incomes would in effect be punitive damages, by pointing out that the income in the case before them was in the "lower or middle reach of the income scale". Similarly, in the instant case, in which the Plaintiff has earned approximately $20,000 in the last 12 months, the Plaintiff is in the acceptable income range. That being the case this Court is constrained to follow the rule of our Circuit which requires:

> Where state law is silent . . . no adjustment for income tax need be made 'at the lower or middle reach of the income scale'. *Kalavity, supra,* at 812.

2. *Inflation—Present Value*

The final questions raised with regard to Mr. Draisma's earning capacity award is how the matters of inflation and present valuation should be resolved. As with the taxation issue, this is a question to be resolved with reference to Michigan law. While Michigan law on inflation was ambiguous for the past 20 years (with the cases apparently utilizing inflation only to rebut the claims of excessive awards), a recent appellate decision has clearly stated that inflation may properly be considered in calculating future impairment to earning capacity. That court, in *Tiffany v. The Christman Company*, 93 Mich.App. 267, 287 N.W.2d 199 (1979) held:

> . . . no reversible error occurred when the expert considered inflation as a factor when computing the future loss of wages. Though prior case law is not uniform on this point (citations omitted) we believe that the existence of inflation has become such a fact of present day life

that it cannot realistically be completely ignored. At 280, 287 N.W.2d at 204–205.

The next question, is what inflation rate should be used. In presenting his calculations the Plaintiffs' economist used an inflation factor of 7.25 percent, a figure which took into account Plaintiff's actual wage increases of about 8.2 percent in the last ten years. Plaintiff called this figure conservative in light of the current 14–18 percent inflation rate. The Court finds that Plaintiffs' figure within the range of reasonableness, but in light of the long period of time over which the damages are to be figured, opts for a slightly more conservative figure of 6 percent; recognizing that the present conditions are the most concrete indicator of where our economy is heading, yet still aware of the many changes and reversals which are likely.

The next question is what figure is to be applied to reflect the advantage the Plaintiff enjoys by having a lump sum award rather than annual installments, or more succinctly: what is the present value of the future annual damages? The Plaintiff argues that Michigan law requires the use of the statutory legal judgment rate of 6 percent. *Freeman v. Lanning Corporation*, 61 Mich.App. 527, 531, 233 N.W.2d 68, 70 (1975). The Defendant reiterates the punitive argument which was raised in connection with the proposed reduction for tax and for this position it relies upon *O'Connor v. United States*, 269 F.2d 578 (2 Cir., 1959).

The federal standard which the Defendant proposes requires a discount factor at the rate of earnings which a person without financial skill could safely secure on their investments. *O'Connor, supra.* Several circumstances must be considered in light of this standard. Initially it may be judicially noticed that the government bonds do not show as high a rate of returns since the time of trial, and one is not assured of obtaining a 10 percent rate of return on their money when the government approves payment of the judgment. A second consideration is that Plaintiffs cannot tie up the funds in long term investment since they will need the money for medical and living expenses. Furthermore, one cannot be sure that a person without financial skill would invest in such bonds as opposed to merely putting it into a savings account.

The above argument is merely intended to show that the difference in positions is not a drastic as it might otherwise seem, although such discussion is not required since the Court believes, for the same reasons as were earlier expressed in the context of income taxes, that the Michigan law regarding these damages is not punitive and therefore not inconsistent with the FTCA. Following the logic of *Kalavity v. United States, supra* and the specific holding of *Reminga v. United States*, 448 F.Supp. 445 (D.C., 1978), which reduced the judgment by 6 percent per year in a FTCA case under the authority of the Michigan statute establishing the legal interest rate, the Court concludes that a 6 percent rate shall be used. It should be noted that the 6 percent inflation rate and the 6 percent discounting will offset each other.

*Future Intangibles of Mr. Draisma*

Defendant does not contest the validity of Mr. Draisma's claim for future pain and suffering, but does disagree as to the amount and to the treatment of present value and inflation. The latter issues were considered with regard to earning capacity and the Court sees no reason why they should not be treated consistently here. The Court therefore finds offsetting inflation rate and present value rate of 6 percent. As to the "amount", the Plaintiff and Defendant appear to be in substantial agreement, with the former seeking $8,000 per year, and the latter arguing that no more than $5,000 is necessary to fairly compensate. In making this subjective determination the Court will only note that the present disabilities Mr. Draisma faces are permanent, and that the same factors that justified an award from the time he started back to work until the date of trial are still present, other than the exercises and job readjustment. The Court feels that the

continuing intangible injuries to Mr. Draisma warrant compensation of $6,000 per year for his life expectancy.

In so awarding these damages the Court rejects the contention of the Plaintiff that GBS caused a second form of kidney ailment. In the course of his research the Plaintiff's counsel became aware of some medical studies which showed a correlation between GBS and glomerulonephritis—"a variety of kidney disease in which the glomerul, the tufts formed by the tiny blood vessels are inflamed." *Attorney Dictionary of Medicine Schmidt Vol. I.* Counsel, during cross examination of the Defendant's neurologist, was able to establish that some of the symptoms of glomerulonephritis did occur during the Plaintiff's hospitalization, but the expert held firm in his position that the occurrence of this second kidney disease was only a possibility and not a strong probability. Although the fact finder is not required to accept the expert's testimony as determinative, and there may be some difference of opinion as to exactly what his position was in terms of certainty, the Court is persuaded that the existence of this second disease was not substantially founded, and in any event it was not established that such a problem, if it did exist, will have long lasting complicating effects upon the Plaintiff's kidneys and general health.

The government properly raised the issue of the Plaintiff's life expectancy. Michigan law disfavors use of mortality tables when the Plaintiff has a pre-existing condition or disease which adversely affects his projected lifespan, since the tables are based on the lives of healthy persons. See *Norris v. Detroit United Railway*, 193 Mich. 578, 160 N.W. 574, 575 (1916). In this case the Plaintiff's polycystic kidney disease was established to be a potentially severe degenerative disease. Although it may be prejudicial error to present this evidence before a jury, the Court can properly accept the evidence considering its limited probative value.

The Defendant presented mortality statistics concerning dialysis patients, and the Plaintiff has been projected to become such a patient in 1984–5 or 1995–6. The neurologist testified that dialysis patients have a mortality rate of 10 percent per year according to certain records kept by the Michigan and the National Registry concerning dialysis patients. Taking these figures as correct, a patient would have a life expectancy of 5 years once he underwent dialysis which means that the Plaintiff would have a life expectancy of 9 to 21 years. (1989–90 or 2000–01)

The Defendant asks that the diverging estimates be averaged to find a life expectancy of 15 years instead of the 21.7 that would be found if one used the Michigan mortality tables. Since neither date of dialysis is more accurate than the other, one might argue that it is incumbent upon the Defendant to establish a date other than the one suggested by the standard mortality tables and it has failed to support this burden. Additionally, the Plaintiff's expert brought out the relative newness of dialysis and the developments which are taking place in the field of neurology. In light of the progress in this area of medicine the Court is of the opinion it would be unduly pessimistic to accept these statistics and concludes that the Defendant has a life expectancy of 20 years.

*Future Loss of Consortium*

Mrs. Draisma's injury has not been contested by the Defendant save as to the amount and calculation of inflation and present value. As stated above, the inflation and present valuation are offsetting at 6 percent each. The Court is of the opinion that Mrs. Draisma's future losses, although real and permanent, in that her husband's injuries are permanent and will deprive her of some of the marital privileges that she has enjoyed in the past, are not, however, of a substantial nature. Therefore the Court finds that the Defendant's figure of $1,000 per annum will adequately compensate the Plaintiff. This amount will be paid over Mr. Draisma's life expectancy of 20 years

since his is the measuring life for this type of injury.

Plaintiff's damages are summarized as follows:

| | | |
|---|---|---|
| Medical Expenses | | $20,976 |
| Past Intangible injuries to Mr. Draisma | | |
| 117 days of hospitalization at $150 per day | $17,550 | |
| 114 days of recuperation at home before returning to work at $75 | 8,550 | |
| After returning to work on July 22, 1977 to trial (April 30, 1980) at $8,000 per year (2.83 years) | 22,640 | 48,740 |
| Past Loss of Consortium | | |
| 117 days of husband's hospitalization at $100 per day | 11,700 | |
| 114 days of husband's recuperation at home at $50 per day | 5,700 | |
| From date returned to work until time of trial (2.83 years) at $1,000 per year | 2,830 | 20,230 |
| Loss of Earning Capacity | | |
| Before trial lost wages | 11,249 | |
| From trial to April 30, 1987 at $5,000 per year | 35,000 | |
| Post dialysis until retirement (April 30, 1987 until September 1 1992–5⅓ years) at $10,000 | 53,333 | 99,582 |
| Future Intangibles—Mr. Draisma | | |
| Life expectancy of 20 years at $6,000 per year | | 120,000 |
| Future Loss of Consortium | | |
| 20 years at $1,000 per year | | 20,000 |
| | | $329,528 |

Plaintiffs are awarded a judgment in the above sum with interest to be computed at the rate of 4 per centum per annum from the date of the judgment as provided in 28 U.S.C. § 2411(b).