KURTA *v.* PROBELSKE.

1. AUTOMOBILES—PLACE OF ACCIDENT—CONFLICTING TESTIMONY.
   In southbound pedestrian's action against eastbound motorist
   for injuries sustained just before 2 a. m. on through highway,
   where evidence was in conflict as to whether accident oc-
   curred at intersection or easterly thereof, a question for the
   jury was presented although following the accident, the un-
   disputed testimony is that plaintiff's body rested at souther-
   ly edge of pavement.

2. SAME—NEGLIGENCE—PEDESTRIANS—CONTRIBUTORY NEGLIGENCE—
   EVIDENCE—QUESTION FOR JURY.
   In pedestrian's action against motorist for injuries sustained
   as plaintiff was crossing 20 feet of paved highway, where
   evidence as to defendant's negligence and plaintiff's con-
   tributory negligence was directly in conflict, an issue of fact
   for jury was presented.

3. APPEAL AND ERROR—NUMBER OF WITNESSES—GREAT WEIGHT OF
   EVIDENCE.
   Where conflicting testimony on issues of defendant's negli-
   gence and plaintiff's contributory negligence presented ques-
   tions of fact for jury, Supreme Court will not hold jury's
   verdict against the great weight of the evidence merely be-
   cause a larger number of persons who were present at the
   scene of the accident testified in behalf of defendant than
   for plaintiff, especially where they sustained a close family
   relation with defendant.

4. EVIDENCE—JUDICIAL NOTICE—COLLISION OF FORCES.
   Courts are slow to take judicial notice of the phenomena at-
   tending colliding forces as frequently strange and inscru-
   table results attend the meeting of such forces.

REFERENCES FOR POINTS IN HEADNOTES
[2] 5 Am. Jur., Automobiles, §§ 673, 703.
[7] 15 Am. Jur., Damages, § 71.
[8] 15 Am. Jur., Damages, §§ 205, 366.
[9] 3 Am. Jur., Appeal and Error, §§ 1173, 1178.

5. DAMAGES—MITIGATION—UNEMPLOYMENT BENEFITS.

The fact that plaintiff received unemployment benefits during disability because of defendant's negligence does not mitigate damages recoverable for personal injuries received.

6. SAME—CONCUSSION OF THE BRAIN—LOSS OF EARNINGS—HOSPITAL AND OTHER EXPENSES.

Verdict of $2,650 in favor of 42-year-old man in good health and capable of performing heavy manual labor as a contract miner who had recently been paid over $100 every two weeks for his services, had earned 75 cents an hour for an 8-hour day and 5½-day week on a delivery truck, who was unable to work for 10 months and had hospital, medical and other expenses for professional services in excess of $300 *held*, not excessive for various injuries, including concussion of the brain, and for pain and suffering.

7. SAME—PERSONAL INJURIES—PAIN AND SUFFERING.

There is no absolute standard by which the amount of damages in personal injury cases can be measured and the amount allowed for pain and suffering must rest in the sound judgment of the trier of the facts.

8. SAME—EXCESSIVE VERDICTS.

Courts are reluctant to disturb verdicts of juries for personal injuries on the ground that the amount is excessive.

9. APPEAL AND ERROR—VERDICTS AND FINDINGS—PREJUDICE—SYMPATHY.

The Supreme Court does not usually substitute its judgment for that of a jury in a personal injury action unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy.

REID, J., dissenting.

Appeal from Gogebic; Landers (Thomas J.), J. Submitted October 14, 1948. (Docket No. 74, Calendar No. 44,211.) Decided April 11, 1949.

Case by Michael A. Kurta against Kathryn Probelske for damages for personal injuries sustained when he was hit by defendant's automobile.

Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*William F. Pellow* (*S. W. Patek*, of counsel), for plaintiff.

*Charles M. Humphrey* and *Charles M. Humphrey, Jr.*, for defendant.

NORTH, J. This is an action by the plaintiff for damages for personal injuries received by him on October 14, 1945, when he was struck by defendant's car which was being driven by her. On trial before a jury a verdict was returned for the plaintiff in the amount of $2,650. The defendant appeals from the judgment entered on this verdict.

This accident occurred in the early morning hours of October 14, 1945, on highway US-2, in the city of Ironwood, Michigan. The plaintiff, who is a resident of the city of Ironwood, was 42 years of age, at the time of the accident. The defendant is a resident of the near-by city of Bessemer, Michigan, and at the time of the accident she was driving her car in an easterly direction on US-2 en route to Bessemer.

According to the testimony of the plaintiff, he had worked the day of October 13, 1945, and after having dinner with his mother at her home in Ironwood, had gone to O'Leary's tavern where he played cards with some of his friends. He remained at the tavern until about 1:45 in the morning of October 14, 1945, and during the evening had consumed 3 or 4 glasses of beer, but had refused a nightcap just prior to leaving the tavern. After leaving the tavern he crossed to the sidewalk on the north side of highway US-2, walked westerly to Zinn street and then turned north on Zinn street in the direction of his wife's home. However, the plaintiff had only gone

a short distance north on Zinn street when he remembered that he had an appointment to go into the woods in the morning and that the clothes he would need were at his mother's home, which was several blocks south of highway US–2. He turned around and walked south on Zinn street toward the intersection with highway US–2, which he intended to cross and proceed south on Zinn street to a path to the railroad tracks which lead towards his mother's home. As he neared the intersection, he stopped on the shoulder of the highway about 2 feet off the pavement, looked to the east, and saw no one coming from that direction. Then he took a step onto the paved portion of the highway, which was 20 feet in width, and looked to the west. When he looked to the west he saw a car approaching from that direction about 2 blocks away, so he remained where he was standing, but again looked to the east to be sure that he was safe from traffic in the westbound lane of the highway. When he again looked to the west this car he had seen, which was the defendant's, "was right on top of" him. He tried to jump out of the way, but it struck him and he suffered the injuries for which he seeks recovery. The negligence charged against defendant includes failure to keep a proper lookout and driving her automobile on the wrong side of the highway.

According to the testimony for the defendant, she, in company with her husband, her brother-in-law and his wife, left from the latters' home in Bessemer, Michigan, at about 10:45 o'clock in the evening of October 13, 1945, and went to Michael DeStasio's tavern in Bessemer where they remained for about three-quarters of an hour, during which time they consumed two glasses of beer apiece. From there the four of them sitting in the driver's seat of the defendant's Plymouth coupe drove to the St. James hotel in the city of Ironwood, where they each had

another beer. After a while they left the St. James and drove to the Burton House in Hurley, Wisconsin, where the defendant had a hamburger and french fries but nothing more to drink. The two male members of the group each had another beer at the Burton House. They left the Burton House sometime between 1:15 and 1:30 on the morning of the accident and, after getting on highway US-2, proceeded in an easterly direction toward the city of Bessemer. Again all four of these adult persons were in the driver's seat of the defendant's coupe.

The testimony for defendant is further to the effect that as her automobile drew near to the Silver Dime tavern, located at the northeast corner of Zinn street and highway US-2 in Ironwood, defendant decelerated to a speed of between 20 and 25 miles per hour, and at that time dimmed her lights because, as she stated, there was a car coming toward her from the east. She testified that she saw the plaintiff for the first time just as the approaching car passed her, that he seemed to be thrown or fell in front of her car, and that he was so close to her car she didn't have time to avoid hitting him. She stopped her car within one or two car lengths from the point of impact, pulled off the highway and then, upon being flagged, a passing motorist took plaintiff to the hospital. Defendant's testimony is that at the place of the accident her car was proceeding on the south side of US-2.

There is conflict in the testimony as to whether the accident occurred in close proximity to the intersection of US-2 and Zinn street, or whether, according to testimony for defendant, it occurred 150 to 200 feet east of the intersection. In this respect there was an issue of fact for the jury. The undisputed testimony is that following the accident plaintiff's body rested at the southerly edge of the paved portion of US-2.

Defendant contends the trial court should have held that plaintiff was guilty of contributory negligence as a matter of law and that defendant was free from negligence. She also contends that the plaintiff failed to sustain the burden of proof; that the verdict of the jury was against the weight of the evidence, and finally that the damages awarded were excessive.

As disclosed earlier in this opinion, there was direct conflict in the testimony for the respective parties as to the facts and circumstances attending this accident. Clearly an issue of fact for the jury was presented as to both negligence and contributory negligence, which were defined in the court's charge to the jury. No complaint is made of the charge, which also covered burden of proof, credibility and weight of testimony. Under this record we cannot say that the verdict was against the great weight of the evidence. In so holding we are mindful that a larger number of persons who were present at the time and place of the accident testified in behalf of defendant than for plaintiff; but such witnesses for defendant were interested in that they sustained a close family relation to her.

"It is elementary that the weight of testimony does not depend upon the number of witnesses." *Buchel* v. *Williams,* 273 Mich. 132, 139.

"That the verdict is against the great weight of the evidence is not determined by the fact that the opposite party had the greater number of witnesses." *Shapiro* v. *Kamman* (syllabus), 235 Mich. 337.

Mr. Justice Reid has written for reversal in this case on the ground that the verdict of the jury was contrary to the great weight of the evidence. In so doing he comments on plaintiff's physical injuries not having been as serious as would be expected if the accident happened as plaintiff claims, and in

that connection on at least two occasions in his opinion assumes that plaintiff "was *thrown* what must have been nearly 40 feet in a southeasterly direction." All parties admit plaintiff was struck by defendant's car and the extent of his injuries can hardly be said to be indicative of where the impact occurred; and further no one has claimed in this case that plaintiff was *"thrown"* 40 feet. In amplification of the record in this respect and in the light of which the jury reached its verdict, the following should be noted. Defendant's husband, who testified in her behalf, sat in the middle of the front seat of defendant's car at the time of the accident. The following is from his testimony:

"Mr. Kurta fell right over the line (evidently the center line of the highway). He had great force behind it and slid along our front bumper onto the south shoulder of the road. * * *

"Q. Did his (plaintiff's) body move forward or east after it was struck?

"A. It seemed to slide right along our bumper.

"Q. Did your car carry him east at all or did he go right straight across?

"A. When he was hit he seemed to slide right along our bumper.

"Q. Did his body move any east after it was struck?

"A. That I don't know. * * *

"I could see the course of his body after the car struck him, it seemed to follow our bumper until it hit the shoulder and the car was moving all that time. * * *

"Q. Your car didn't run over him, did it?

"A. No, absolutely not.

"Q. And he wasn't thrown up in the air?

"A. No, sir, he wasn't."

This witness also testified to a circumstance which might have led the jury to give plaintiff's testimony that he was on the northerly side of the pavement

much more credence than it otherwise would have been inclined to do. Directly across highway US–2 from where plaintiff claims he was struck by defendant's car was located Rowe's gasoline station. Defendant's husband testified: "We were about a half a block west of the intersection of Zinn street when a car drove off from in front of Rowe's gasoline station and we slowed up for that car." If defendant not only slowed up her car on account of a car in front of her on the south side of the highway but also had swerved her car to her left, as plaintiff in effect testified, because the other "car drove off from in front of Rowe's gasoline station," the course of defendant's car just before the impact would have been as plaintiff testified. And further, which the jury might well have inferred, if at the instant of the impact defendant travelling 20 to 25 miles per hour had veered her car to the right and (as defendant's husband testified) "his (plaintiff's) body after the car struck him  *  *  *  seemed to follow our bumper until it hit the shoulder" and the "car didn't run over him," the manner in which plaintiff's body came to rest at the southerly edge of the pavement is reasonably obvious; and that circumstance can scarcely be a justification for concluding that the verdict of the jury was contrary to the great weight of the evidence.

In an automobile accident case wherein judgment for plaintiff was affirmed in this Court, Justice FEAD, who wrote the prevailing opinion, said:

"I am in accord  *  *  *  in wondering how plaintiff's car reached its position after the accident.  *  *  *  Automobile accidents and collisions are attended by strange, unexpected, and apparently incredible results, which seem to defy the commonly known laws of physics and their effects.  *  *  * The courts are properly slow to take judicial notice of the phenomena attending colliding forces be-

cause, as was said in *Basting* v. *Railroad Co.,* 39 App. Div. 629 (57 N. Y. Supp. 119): 'The study of accidents shows strange and inscrutable results, sometimes stranger than fiction.'" *Prove* v. *Interstate Stages,* 250 Mich. 478.

Our opinion in the *Prove Case* also quotes with approval the following:

" 'So frequently do unlooked for results attend the meeting of interacting forces that courts, in such cases, should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other.' *Lang* v. *Railway Co.,* 115 Mo. App. 489, 497 (91 S. W. 1012)."

My Brother attaches importance to plaintiff's statement to the police officer following the accident; but in that connection it should be noted that plaintiff, referring to how the accident happened, told the police officer: "I don't know only what I was told by the party that hit me." Further, Dr. Gertz, who attended plaintiff following the accident, testified that he had concussion of the brain and that for 3 days plaintiff was mentally confused. Plaintiff does not claim any personal knowledge of the circumstances attending the accident after he was struck by defendant's car. Evidently the jury was not disposed to discredit plaintiff's testimony in consequence of statements he is claimed to have made while in an injured and dazed condition shortly after the accident. In any event, how much more incredulous is it that, as plaintiff claims, he was approximately 8 feet north of the center line of the pavement when struck, than that (as defendant claims) he was then near the center line? In either case all agree his body came to rest at the southerly edge of the pavement. In the former case plaintiff's

body would have been carried only approximately 8 feet further than in the latter. In its physical aspects plaintiff's explanation of how the accident happened is scarcely more unusual than defendant's.

My Brother notes that plaintiff "drank four beers" (defendant testified she had drunk only three beers) sometime during the evening prior to the accident. But even if it could be inferred that plaintiff was somewhat intoxicated, which was a question for the jury, in event the accident happened as plaintiff claims, under the conflicting testimony defendant's liability still would have been for the jury's determination. Obviously the jury also might have considered defendant's condition for driving an automobile with her 3 beer-drinking adult companions along with her in the driver's seat.

In view of the conflicting testimony the jury's verdict ought not to be nullified by mere speculation on our part as to the manner in which the accident happened. The verdict of the jurors quite conclusively indicates that they did not believe defendant or her eyewitnesses, all of whom stood in a family relation. Except this Court supplants the jury in this case, we cannot hold the verdict was against the great weight of the evidence.

Defendant's final contention is that the damages awarded were excessive. In this connection defendant points out that plaintiff received certain unemployment benefits during his disability. This in no way serves to mitigate damages. In *Cawood* v. *Earl Paige & Co.*, 239 Mich. 485, we said that in an action for damages for personal injuries the question of whether or not plaintiff carried insurance was not involved. We there held: "Defendant's counsel had no right to inquire whether plaintiff was carrying accident insurance."

Defendant's contention that the damages awarded were excessive is so obviously contrary to the rec-

ord that we refer only briefly to the relevant testimony which discloses the following. Immediately prior to the accident plaintiff was an able-bodied man in good health, capable of performing heavy manual labor. As a contract miner he had recently been paid somewhat in excess of $100 every two weeks for his services; and immediately preceding his injury, for his work in connection with a truck delivering cement, coal, lumber and other products for his employer, he earned 75 cents an hour and ordinarily worked 8 hours per day 5½ days per week. As a result of the accident plaintiff was unable to work for upwards of 10 months, and he incurred hospital and medical bills and expense for professional services in excess of $300. As a result of the accident plaintiff sustained rather severe and painful injuries to his head, neck, shoulders and both legs. He did not fully regain consciousness until at least 3 days after the accident. He remained in the hospital for 16 days and upon being released he stayed at his mother's home some months while he was convalescing and before going outside the house. He suffered pain, headaches and dizziness, and to some extent this condition existed even at the time of the trial a year after the accident. During the period he was in the hospital he was attended by his physician every day and sometimes twice a day. This doctor testified plaintiff had concussion of the brain and various other physical injuries.

In *Gibbons* v. *Delta Contracting Co.*, 301 Mich. 638, at page 653, quoting from *Cleven* v. *Griffin*, 298 Mich. 139, 141, we said:

" 'There is no absolute standard by which we can measure the amount of damages in personal injury cases. The amount allowed for pain and suffering must rest in the sound judgment of the triers of the facts. *Watrous* v. *Conor*, 266 Mich. 397; *Weil* v. *Longyear*, 263 Mich. 22. Courts are reluctant to dis-

turb verdicts of juries for personal injuries on the ground that the amount is excessive. *Cawood* v. *Earl Paige & Co.*, 239 Mich. 485. We do not usually substitute our judgment for that of the jury unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy.' "

The trial court ruled correctly in denying defendant's motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial. The judgment entered in the circuit court is affirmed, with costs to plaintiff.

SHARPE, C. J., and BUSHNELL, BOYLES, DETHMERS, BUTZEL, and CARR, JJ., concurred, with NORTH, J.

REID, J. (*dissenting*). The evidence in this case clearly preponderates in favor of defendant and for that reason I cannot concur in the opinion of my Brother Mr. Justice NORTH.

Shortly after the accident and while in the hospital, plaintiff signed a written statement prepared by police officer McManman, in which statement plaintiff said he had no recollection of how the accident occurred. The officer was merely acting in his capacity as officer of the law, was not the agent of any interested party, and was not shown to be interested in any endeavor to trap the plaintiff into making damaging admissions. Although plaintiff was laboring under some confusion after the accident, the officer found him capable of answering questions.

That plaintiff said he had no recollection as to how the accident happened was also testified to by the doctor who examined plaintiff when the police officer was not present.

Defendant testified that at the hospital and before the doctor called on plaintiff there, plaintiff said to defendant that it wasn't her fault that the

accident happened.   Plaintiff when asked as to that matter testified:

"*Q.* Mr. Kurta, you said at the hospital that night you did not tell these people that the accident was your own fault?

"*A.* I don't remember.

"*Q.* You don't remember?

"*A.* Yes, I don't remember.

"*Q.* You don't mean to say you did not tell them that?

"*A.* No, I don't remember."

Plaintiff, who admits that he drank four beers during the night in question, proceeded on the witness stand to relate a story not only contradictory to his signed statement and the statement he had made to the doctor, but also inconsistent with the undisputed fact that he was lying on the south side of US-2 after the accident was over, about 40 feet southeast of the place where plaintiff claims he was struck.

It could not very well be true (as plaintiff testified) that when at a point two feet south of the north side of US-2 he made a quick turn toward the *north* and was struck by defendant's *eastbound* car with the result that he was thrown what must have been nearly 40 feet in a *southeasterly* direction.   It is highly improbable that a body going *north* would, when struck by the left fender of an *eastbound* car, go *southeast*.   Further, the impact in order to throw plaintiff southeast about 40 feet would of necessity cause broken bones or at least something beside the scratches and bump testified to by the doctor, and in all probability would cause some visible damage to defendant's car, and it is undisputed that no damage was done defendant's car.

Plaintiff made statements to the unemployment compensation commission and on such statements

obtained unemployment compensation, his statements being to the effect that he was offering himself continually for employment during the period for which he obtained unemployment compensation and that he was able to do the work for which he offered himself. On the witness stand in this case he claimed to the jury, obviously for the purpose of proving one element of damages, that he was laid up and incapable of working during the period covered by his compensation. His contradictory statements make his testimony unreliable.

Further, plaintiff's testimony that he stood where traffic might hit him on the paved portion of the street for no purpose other than looking east for nonexistent traffic where he had a clear view for a quarter of a mile, while plaintiff's car traveled two blocks, is such a statement as to indicate that he was drunk and didn't know what he actually was doing, and that he has no real recollection of what happened.

The defendant Kathryn Probelske has been employed by the bureau of social aid of the State of Michigan about six years and is a graduate of Michigan State College. It is the undisputed testimony that defendant had complete control of her car. Defendant's husband sat beside her, and defendant's brother-in-law sat on the extreme right of the front seat with his wife, defendant's sister, sitting in his lap. Defendant had sufficient room to exercise her control over the car.

Defendant had been driving about 25 miles an hour as she neared the scene of the accident and slowed down before passing Rowe's gasoline station, and plaintiff in his testimony said that she was not driving too fast. Defendant testified a westbound car was about to pass her, for which car she dimmed her lights and as the two cars were about to pass, plaintiff suddenly appeared, coming from the northerly

half of the pavement and immediately in front of the westbound car with his head well forward, lunging (or was thrown by the westbound car) suddenly into contact with the left front headlight of defendant's car and proceeded southerly, sliding evidently along the bumper of defendant's car, rolled over and stopped at a point where the major portion of his body was off the pavement but some of his body still on the pavement on the southerly side of the paved portion of the street. Defendant stopped her car immediately, her car did not run over the body of plaintiff, and after her car had come to a stop, she drove her car forward onto the shoulder of the road to be out of the way of traffic. Defendant and the parties in the car hailed another passing car, which took plaintiff to the hospital.

Witness Edward Probelske, the husband of defendant, a salesman for Investors Syndicate, was seated in the middle of the seat and beside his wife as she was driving. He testified that just previous to the accident his wife was driving 15 to 20 miles an hour and she had slowed up at the intersection of Zinn street because there were cars parked in front of the tavern and people were coming out at that hour, and that as defendant's car had passed from Zinn street and had gotten almost to the center of the block, a car was coming westbound. He further testified that as the westbound car passed defendant's car, plaintiff "fell right over the line. He had great force behind it and slid along our front bumper onto the south shoulder of the road," and that the defendant's car came to rest about a car length from where the plaintiff was lying. As the plaintiff was lying on the shoulder of the road and his foot or feet touching the concrete, witness had a conversation with plaintiff and asked plaintiff if he was hurt. Plaintiff said, "No, I want to go home." After plaintiff was taken to the hospital,

witness saw him there and remained there until almost 4 o'clock in the morning. Witness further testified, "He [plaintiff] told my wife to go home, it wasn't her fault, that he would be all right."

Lucille Probelske, wife of Clarence Probelske, was riding in defendant's car and seated on her husband's lap at the time of the occurrence of the accident. She testified:

"We just passed the Silver Dime Tavern and just getting right alongside of the vacant lot when a car was ready to pass us and just as the car was passing us a man, I wouldn't say he stepped, he more fell in front of our car. That's all I saw of the accident. That was the first time I saw Mr. Kurta, just as he was ready to go over the center line of the road."

The other occupant of the car, Clarence Probelske, was looking to the right just before the accident and was therefore unable to give testimony directly on the question of how the accident happened.

The testimony given by defendant's witnesses offers a reasonable explanation for the undisputed fact that the body of plaintiff was on the south side of the pavement after the accident was over, without his having been run over by defendant's car.

Without his own testimony as to how the accident happened, plaintiff had no case to go to the jury. His testimony is contradicted by his own written statement; his credibility as a witness is weakened by his false claim of inability to work after the accident happened. Logically considered, the physical facts show the high improbability of plaintiff's account of the accident, even without taking into consideration the testimony of the unimpeached witnesses who testify to a contrary effect. We are of the opinion that the weight of the testimony clearly preponderates against plaintiff's claim.

The trial court erred in not granting a new trial. The case should be remanded to the trial court with instructions to set aside the verdict and judgment and order a new trial, costs to await the result of the trial.