Charles COLLINS, Plaintiff,

v.

Tommy ROBINSON, Sheriff of Pulaski County, Arkansas, Individually and in his Official Capacity, and Pulaski County, Arkansas, Defendants,

James Woody McNeely, Intervenor.

No. LR–C–82–358.

United States District Court,
E.D. Arkansas, W.D.

Aug. 3, 1983.

Richard L. Mays and Judith C. Lansky, Little Rock, Ark., for plaintiff and intervenor.

Stephen Curry, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

WOODS, District Judge.

### The Pleadings

Claiming that he had been wrongfully discharged, Charles Collins, a black sergeant in the correction division of the Pulaski County Sheriff's office, sued Sheriff Tommy Robinson on May 17, 1982 for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., along with 42 U.S.C. § 1983. His complaint was amended on November 8, 1982 to include allegations under 42 U.S.C. § 1981 and to specifically allege that the § 1983 violations involved his rights under the First and Fourteenth Amendments to the United States Constitution. He also joined Pulaski County as a defendant. Collins subsequently dismissed his § 1981 claim. On March 14, 1983 James Woody McNeely, a black deputy assigned to the patrol division of the sheriff's office, moved to intervene in this litigation to assert a claim for discrimination and failure to promote. His intervention, permitted April 7, 1983 was based on the same statutes, but McNeely subsequently restricted his claim to a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Robinson and the County answered by denying the allegations of the plaintiff and intervenor and demanded a jury trial as to the § 1983 allegations. By agreement, all the testimony concerning the Collins discharge was presented to the jury, with the Court reserving opinion as to whether Collins' proof had established a Title VII violation. The proof concerning the failure to promote McNeely was heard in the absence of the jury. The Collins case was submitted on six

interrogatories. These interrogatories and the answers made thereto are as follows:

INTERROGATORY NO. 1: Do you find that the memorandum of November 10, 1981 was a substantial and motivating factor in Charles Collins' discharge by defendant Robinson?

ANSWER: Yes.

INTERROGATORY NO. 2: Do you find that defendant Robinson would have discharged plaintiff Collins even if he had not written the memo of November 10, 1981?

ANSWER: No.

INTERROGATORY NO. 3: Do you find from a preponderance of the evidence that Charles Collins was discharged by Sheriff Robinson in violation of his right to due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States?

ANSWER: Yes.

INTERROGATORY NO. 4: Do you find from a preponderance of the evidence that execution of a Pulaski County policy or custom deprived Charles Collins of his rights under the First and Fourteenth Amendment as those rights have been defined under the instructions of the Court?

ANSWER: No.

INTERROGATORY NO. 5: State the amount of any damages which you find from a preponderance of the evidence should be awarded to Charles Collins as compensation for the deprivation of his rights under the United States Constitution.

ANSWER: $5,927.00.

INTERROGATORY NO. 6: State the amount of any punitive damages which you find from a preponderance of the evidence should be assessed against Sheriff Tommy Robinson.

ANSWER: None.

### Collins' First Amendment Claim

This claim involves a memorandum that Collins wrote to the Sheriff after a November 10, 1981 encounter with Major Mark Bowman, head of the patrol division and second in command of the department.

Some background is appropriate. On the night of November 10, 1981 there was a meeting of the Quorum Court of Pulaski County attended by about one-third of the total work force of the sheriff's department. The Quorum Court as the County legislative body was considering the Sheriff's budget, and the employees of the sheriff's department were advocating a larger budget and higher salaries. At the forefront of this lobbying activity was the union to which almost all of the men below the rank of major belonged. Rumors were rife and excitement was high at this session attended not only by about seventy-five departmental employees but also by their families and members of the general public. One rumor that reached the ears of the Sheriff, but which turned out to be completely baseless, was that there would be a strike involving department personnel at the county jail and that as a result of such action the prisoners would be left unguarded and unattended. Robinson testified that he told Major Bowman, his second in command and head of the patrol division, to immediately go to the jail, investigate the situation and stop any such walkout. When Bowman arrived at the jail, he confronted Collins who was the sergeant in charge of the shift. Collins denied any knowledge of a walkout and stated that he did not intend to leave his post. He told Bowman that if the other employees walked off, he did not know what he could do to prevent it but again denied having any indication that such a walkout was in the offing. His response did not satisfy Bowman, who launched into a highly abusive and vulgar personal tirade, the content of which was reported to the Sheriff in a memorandum composed and typed by Collins after Bowman left. Collins did not personally respond to Bowman's abusive conduct, which occurred in the presence of other employees of the sheriff's office. Collins testified that he "took it" because he felt that the professional way to respond was to write an account in memo form to Major Bowman's only superior, Sheriff Robinson. The memorandum reads as follows:

On this date at approximately 2310 hours, I Sgt. Collins was giving the officers that work in the pods a break. When Sgt. Dicus, Cpl. Mewborn, Officer Clement, Officer Jackson, and two other officers came in to the breakroom from the Quorum Court meeting. I had three officers on lunch break, which were, Officer Kimble, Officer Eckman, Officer Goodman and Officer Madden coming down off the roof. Major Bowman came to door # 2 and began beating on the door. I (Sgt. Collins) went to the door and let him in. When he came in he began cursing out loud, and said I can't stand a bunch of yellow, coward, quiting motherfuckers. He said not ₐa motherfucker is going to leave here tonight. He said if any son of bitch leaves he was going to arrest them. He kept yelling and cursing as he was going out the door, and as he was going out I told him that no one said anything about quitting or leaving, and if they did want to leave or quit I had no right to stop them. He yelled back and said if any motherfucker leaves he was going to put them in jail. I feel I was humiliated and harrassed [sic] in front of my employees and my employees nor myself appreciate being cursed and called names, when we were doing our jobs and had not said anything about leaving or quitting. Nor do we appreciate him calling in patrol units to guard the doors to make sure we didn't attempt to leave. I feel as the shift commander on duty of the jail that Major Bowman should have called me when he heard there was going to be a walkout and ask me about it instead of over reacting as he did. The officers on duty at this time are very upset about it and request that Major Bowman either be disciplined or at least made to apologize in person to the employees that were here doing their jobs. (PX 14)

Collins testified that he successfully maintained self-control and silence with great difficulty because of the epithets used by Bowman. This is certainly understandable in view of the content of Bowman's remarks. Bowman does not claim that Collins' report of his conduct or his remarks was inaccurate in any respect. However, he is not contrite and testified that he would behave in the same manner if presented again with the same situation. Nor does the Sheriff himself question the fairness or accuracy of the memorandum. He states that Collins was fired because he did not make his complaint through proper channels. Robinson's termination letter to Collins dated November 23, 1981 reads as follows:

Effective this date you are hereby terminated for not following our agreed upon procedures for filing your complaint in reference to Major Mark Bowman, i.e., you released the memorandum complaint to numberous [sic] persons in our department which caused dissension within the ranks. (PX 5)

Collins testified that he placed the memo under the doors of all of his superiors in the chain of command: Lt. White, Captain Day, and Major Zoeller. Since the incident occurred at 11:10 p.m., he wanted them to have access to it the following morning. Copies of the memo did receive rather wide circulation. A copy was posted in a conspicuous position at the detention facility and Collins undoubtedly showed copies to detention center employees present at the time of Bowman's outburst. Just who was responsible for the dissemination to other persons is not clear. There is little credible evidence that Collins was responsible for circulating the memo beyond his superiors and those present at the incident, and there is some evidence that he tried to stop such circulation and retrieve extra copies, particularly after being advised to do so by the union president, Mike Maynard.

█ The first question to be decided with respect to plaintiff's First Amendment claim is whether the memo is protected speech. "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers,* —— U.S. ——, at —— n. 7, 103 S.Ct. 1684, at 1690 n. 7, 75 L.Ed.2d 708 (1983). In other words, the trial judge and not the jury must decide this issue. The guiding principles have been clearly enunciated by the Supreme Court. A public employee may not be constitutionally

required to relinquish his First Amendment right to comment on matters of public interest. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement as revealed by the whole record." *Connick v. Myers, supra,* at ——, 103 S.Ct. at 1690.

■ The crux of the question is whether the Collins memo touched upon matters of public concern or "is most accurately characterized as an employee grievance concerning internal office policy." *Connick v. Myers, supra.* The question is always a close and difficult one, but in this case the evidence clearly preponderates in favor of public concern. The memo dealt not only with the complaint of Collins but all other jail employees who were accused of planning a walkout at the jail. The incident grew out of what the Sheriff perceived to be a threatened walkout by deputies at the county jail. The incident was also a spinoff of a crowded and rather tumultuous meeting of the Quorum Court earlier in the evening. Actors on the fringes of the incident included the president of the employee's union. The memo involved the public not the private conduct of the officer who was second in command of a law enforcement agency employing approximately 250 persons with responsibility for the safety of several hundred thousand citizens. Surely this memorandum dealt with matters of great public concern, and without hesitation I find it to enjoy First Amendment protection.

A determination of this issue by the Court does not dispose of the plaintiff's First Amendment claim. As Judge Arnold cogently pointed out in *McGee v. South Pemiscot School District, et al,* 712 F.2d 339, 343 (8th Cir.1983), a case involving discharge of a school teacher:

> It is not enough for a teacher to show that he or she was fired after engaging in constitutionally protected conduct. The plaintiff also bears the initial burden of showing that this conduct was a motivating factor in the board's decision not to rehire. The burden then shifts to the

defendants. They must show by a preponderance of evidence that they would have reached the same decision in the absence of the protected conduct. *Mount Healthy City School District Board of Education v. Boyle,* 429 U.S. 274, 287 [97 S.Ct. 568, 576, 50 L.Ed.2d 471] (1977).

■ These are fact questions properly determined by a jury. *McGee v. South Pemiscot School District, et al, supra.* Accordingly, I submitted Interrogatory Nos. 1 and 2, *supra.* The jury found that the memo was the substantial and motivating factor in the Collins discharge and that the discharge would not have occurred if he had not written the memo. Since the memo was protected speech under the First Amendment, it follows that Collins was discharged for exercising his First Amendment rights and is entitled to damages therefor as found by the jury.

### Collins' Due Process Claim

■ Collins claims that he was denied procedural due process in that he was not afforded a pre-termination hearing. Defendant Robinson contended that Collins had no property right in his job and therefore was not entitled to a pre-termination hearing. The property question has been specifically considered by the Court of Appeals and decided adverse to defendant Robinson in *Wilson v. Robinson,* 668 F.2d 380 (8th Cir.1981). The Court held that Pul.Ord. No. 255, which is part of the record in this case (PX 1) and was in effect at the time of Collins' discharge, gave the deputies a property interest in their jobs. "There can be no doubt that this ordinance creates an expectation of continued employment sufficient to require that procedural due process be afforded to county employees prior to termination. *See Glenn v. Newman,* 614 F.2d 467, 471–72 (5th Cir.1980)." In view of the citation to this Fifth Circuit decision in dealing with the precise due process issue involved herein, I framed an instruction based on the holding in *Glenn v. Newman, supra.* In that case it was said:

> In seeking to minimize the risk of wrongful termination to an employee without

burdening the government with elaborate pre-termination proceedings, this Court has outlined a procedure to meet minimum due process requirements. *Thurston v. Dekle,* 531 F.2d [1264] at 1273. This includes, prior to termination written notice of the reasons for termination and an effective opportunity to rebut those reasons. Effective rebuttal means giving the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision. Id. at 472.

I felt that some fact issues did exist for the jury's determination since Collins and the union president did meet for a short time with Robinson and Robinson contends that this meeting constituted a pre-termination hearing. After giving the jury an instruction based on the above language from *Glenn v. Newman, supra,* I submitted an interrogatory as to whether the due process rights of Collins had been violated. The jury answered the interrogatory in the affirmative. Their answer comports completely with my view of the evidence. Collins is, therefore, entitled to damages as found by the jury for deprivation of his right to procedural due process under the Fourteenth Amendment.

### Collins' Claim against Pulaski County

■ Pulaski County may not be held responsible under a *respondeat superior* theory for the actions of Sheriff Robinson in depriving Collins of his constitutional rights. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The county must be independently involved in such deprivation through its policies or customs or by some type of encouragement of the forbidden acts or omission. Here the county grievance board conducted a post termination hearing after which it concluded as follows:

1. That grievant was unjustifiably confronted and verbally abused by Major Mark Bowman.

2. That grievant made his complaint known to his immediate supervisor as well as the elected official, Sheriff Tommy Robinson, through a written memorandum dated November 10, 1981.

3. That grievant should be reinstated with full back pay and, in addition, the elected official, Sheriff Tommy Robinson, should order Major Mark Bowman to apologize to grievant in the presence of all parties who witnessed the original incident. (PX 8)

Sheriff Robinson refused to reinstate Collins and Bowman refused to apologize. There was no evidence that the County encouraged or participated in the actions of Robinson and Bowman in this matter. Nor is there any indication that Pulaski County has adopted policies or followed customs approving or concurring in such actions. While I submitted an interrogatory to the jury (No. 4, *supra*) as to the liability of Pulaski County, I informed counsel in the jury's absence that an affirmative answer to this interrogatory would be set aside in all probability. Based on the jury's negative answer to Interrogatory No. 4 together with my own assessment of the evidence, judgment will be entered in favor of Pulaski County.

### Collins' Title VII Claim

Since the decision on Collins' Title VII claim is a matter for the Court and must be supported by specific findings of fact and conclusions of law, these are arranged numerically, *infra.*

1. Charles Collins is a 39-year-old black male with six children, ages 3–17 years, for whom he pays child support.

2. He was hired by the sheriff's department in 1975 and has worked in both detention and rehabilitation. He was promoted to corporal in 1977 and in 1980 was made a sergeant.

3. Defendant Tommy Robinson is the duly elected Sheriff of Pulaski County and is the Chief Officer of the Pulaski County Sheriff's Department. Defendant is an employer within the meaning of 42 U.S.C. § 2000e et seq.

4. Defendant Pulaski County, Arkansas is a governmental corporation and at all times relevant hereto Defendant Tommy

Robinson was serving as its elected official. Defendant Pulaski County, Arkansas is an employer within the meaning of 42 U.S.C. § 2000e et seq.

5. Robinson was elected Sheriff in November, 1980. After his election Collins met with Robinson who advised him that he would be retained.

6. Collins was retained after Robinson took office on January 1, 1981 but at the reduced rank of deputy.

7. After Collins filed an EEOC charge on April 8, 1981, he was restored to his former rank.

8. Collins was never the subject of disciplinary action prior to his discharge. Three weeks before his discharge, Collins saved the life of a prisoner who had tried to commit suicide. He received a letter of commendation from Robinson, which read as follows:

> It is with great pleasure I take this opportunity to commend you for your highly professional and dedicated efforts toward the preservation of human life on October 29, 1981.
>
> Your quick thinking and immediate response to an emergency situation reflect credit upon you and on the professionalism that we continue to pursue within this department.
>
> Please accept my sincere congratulations for a job well done. (PX 16)

9. On November 10, 1981 while Collins was serving as shift commander at the Pulaski County jail, he was confronted by Major Mark Bowman, the head of the patrol division. Bowman's actions are accurately described in the memo (DX 14), the text of which is set out, *supra.*

10. Bowman's actions on this occasion were irresponsible and indefensible. His conduct was condemned by the Pulaski County Grievance Board, which recommended that he apologize to Collins. Yet, Bowman received only a verbal reprimand from Sheriff Robinson.

11. On the other hand, Collins was discharged not because his memo was false or inaccurate but because it was not sent through the chain of command and was circulated to other employees.

12. With reference to the alleged "chain of command" irregularity, I find that the memo was given by Collins to all his superiors in the chain of command. Actually, the only individual having authority over Bowman in the chain of command was Robinson himself and the memo was directed to him. Collins did show the memo to other employees at the jail to whom the abusive remarks were also directed. This hardly seems to be a great indiscretion since they, too, were interested in Bowman's being called to account for his actions. Other than this distribution, I find that Collins did not further participate in distribution of the memo.

13. Robinson also claims that he fired Collins because his memo caused dissension among the employees of his office. I find evidence of dissension caused by Bowman's conduct on the night of November 10, 1981, but the record is devoid of credible evidence that the Collins' memo caused dissension in the ranks.

14. I find that there was grossly disparate disciplinary treatment between the treatment of Collins, a black male, and the treatment of Bowman, a white male, as a result of the November 10, 1981 incident.

15. The harsh treatment of Collins is cast into sharp relief by the fact that on another occasion Bowman received only a verbal reprimand for blacking the eyes of a female officer of the Little Rock Police Department, whom the Sheriff described as Bowman's former girl friend. Another deputy was given a 30-day suspension for selling marijuana.

16. The disparate treatment afforded Collins vis-a-vis Bowman has made out a prima facie case of race discrimination. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

17. Robinson has failed to articulate a legitimate business reason for Collins' discharge. I find that the reasons advanced by Robinson are pretextual in nature. The "chain of command" irregularity will not

withstand even casual examination. I fail to find evidence that Collins' memo caused dissension. The dissension resulted principally from the actions of Bowman.

18. On the whole case, I find that Collins has sustained the burden of proving a discriminatory discharge. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### Appropriate Relief in Collins' Case

Judgment will be entered in accordance with the jury verdict on the § 1983 claim in the amount of $5,927.00 representing back pay lost by Collins since his discharge until the verdict date. In accordance with the jury verdict, judgment will be entered for defendant Robinson on the claim for punitive damages.

Robinson claims that he should have a setoff for the amount of unemployment compensation drawn by Collins during the period of his discharge. No setoff will be permitted. "In some types of cases where the wrong under § 1983 is closely analogous to a wrong recognized in the law of torts, it is appropriate for the federal Court to apply the relevant tort doctrines. . . ." *Adickes v. Kress & Co.,* 398 U.S. 144, 231–32, 90 S.Ct. 1598, 1641, 26 L.Ed.2d 142 (1970). This is such a case. Few rules are more firmly settled in the law of torts than the inability of a tort-feasor to claim benefit for payments from a collateral source. This area of tort law is discussed in Woods, *Earnings and Earning Capacity as Elements of Damage in Personal Injury Litigation,* 18 Ark.L.Rev. 304, 316–18 (1965). Unemployment compensation payments clearly constitute a collateral source. *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 364, 71 S.Ct. 337, 339, 95 L.Ed. 337 (1951). They may not be offset in favor of a tort-feasor. *See Kurta v. Probelske,* 324 Mich. 179, 36 N.W.2d 889 (1949) cited in the above law review article at 318, n. 128 for an explicit holding in this respect. *See also Amos v. Stroud,* 252 Ark. 1100, 482 S.W.2d 592 (1972).

Collins is also entitled to back pay by reason of my finding in his favor on his Title VII claim. However, since judgment will be entered in his favor on the jury verdict for back pay until time of trial, this amount will offset the Title VII award for a period from discharge to date of trial. If plaintiff is not reinstated immediately, he will accumulate additional back pay under the Title VII award to the date of reinstatement or waiver thereof. Any future earnings will be offset against such recovery.

With regard to defendant Robinson's contention that unemployment compensation payments should offset the Title VII recovery, I reach the same result as in the § 1983 claim but on different grounds. In *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951) the Supreme Court held that the National Labor Relations Board was not required to deduct unemployment compensation for back pay awards to discriminatorily discharged employees. Subsequently, the Court stated that the back pay provisions of Title VII "was expressly modeled on the back pay provisions of the National Labor Relations Act." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). These decisions considered in tandem present a strong argument for not offsetting the Title VII recovery. Indeed, at least one Circuit has specifically denied the right to offset unemployment compensation against Title VII back pay awards. *E.E.O.C. v. Ford Motor Co.,* 645 F.2d 183 (4th Cir.1981).

In addition to the back pay award under Title VII as set forth above, defendant Robinson is ordered to immediately reinstate Collins to his former position as a sergeant in the sheriff's department at a salary equal to that he would have been earning except for his wrongful discharge. In addition Collins is awarded his costs and a reasonable attorney fee for his very able counsel.

### The McNeely Title VII Claim

McNeely restricts his claim to Title VII of the Civil Rights Act of 1964, and I make the following findings of fact and conclusions of law with regard to this claim.

1. Intervenor James McNeely is a 37-year-old black male employed by the Pulaski County Sheriff's Department as a Deputy on September 15, 1980.

2. He is a high school graduate. After high school he served in the U.S. Infantry in Viet Nam where he was wounded and received a number of decorations including the Silver Star for gallantry.

3. After being honorably discharged from the Army, McNeely worked for Reynolds Metals for eight years (1967–75) but lost his job when the plant closed. During this time he lived at Malvern, Arkansas where he served as a volunteer in the auxiliary of the sheriff's department.

4. When the Reynolds plant closed he obtained a job in security with St. Vincent's Infirmary and later with Safeway at Little Rock. In 1977 he obtained a position as Deputy with the Pulaski County Sheriff's office.

5. In the sheriff's office McNeely first worked in corrections for about six months and then was transferred to the patrol division, where he worked until March, 1980.

6. In March, 1980 McNeely applied for a position as an investigator with the Alcoholic Beverage Control Board and obtained a position as an enforcement investigator, which he felt would enhance his experience and opportunities in law enforcement. He had worked in this position for six months when he was given a mandatory transfer to West Memphis. For personal reasons he could not take the transfer. He felt that it was motivated by the fact that he was married to a Caucasian woman. He returned to the sheriff's office in September of 1980.

7. McNeely had met Sheriff Robinson when he was with the ABC Board, which was under Robinson's supervision as Director of Public Safety, a position he held prior to his election as Sheriff in November, 1980. McNeely met with Robinson after the latter's election and was assured that he would be retained in the department. McNeely expressed the desire to work in the narcotics section of the criminal investigative division. He did some volunteer work with the section but never received an answer to his request. Under Sheriff Robinson's administration, which began January 1, 1981, he was assigned to the patrol division.

8. McNeely has taken training in a number of specialized areas of police work. He attended the Arkansas Law Enforcement Training Academy from February 20, 1978 to March 31, 1978 and successfully completed the Basic Police Training Course (PX 19). He also completed the Field Training course of the Commission on Law Enforcement Standards (PX 21), the course in Basic Emergency Medical Technology (PX 22), and the National Safety Council course in Defensive Driving (PX 18). He has passed the firearms course which qualifies him as a police sharpshooter (PX 20).

9. On September 25, 1981 McNeely along with three other officers received a written letter of commendation from Major Bowman which read:

> I want to commend all of you for your actions during the incident which occured [sic] in Hensley last night. Through courage, determination, and professional police practices, you brought a dangerous situation to a safe conclusion. Your efforts reflect positively on you and our department. (PX 27)

He also received commendation for assistance rendered to tourists with car trouble (PX 26). He was selected officer of the month by the Sertoma Club in 1979.

10. In June 9, 1981 Lt. Adams, McNeely's platoon leader, recommended him and two white deputies. Ballard and Hild, for promotion to corporal. Adams noted: "Each of the above listed officers has exhibited outstanding qualities in the performance of his duties and such a promotion would be a benefit to the department." (DX 1)

11. In April, 1982 McNeely was the only black on a list of five recommended for promotion to corporal. The recommendations were made by superior officers in the department. The five men were interviewed and ranked by another group of superiors who constituted the promotion board on April 20, 1982. The rankings were

in the following order: Craig, Bohannan, McNeely, Sisson, and Bowers. This was supposed to constitute the eligibility list for promotion, subject to concurrence and the final action of Sheriff Robinson. Craig and Bohannan were soon promoted to corporal and on May 15, 1982 Bowers (who had ranked fifth) was also promoted to corporal ahead of McNeely who was ranked third. These facts, which are undisputed, clearly made out a *prima facie* case for McNeely. He was a member of a minority who was qualified for promotion. A white found less qualified by the promotion board was promoted in his stead. Clearly McNeely has met the test for a *prima facie* case as established by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

12. McNeely filed an EEOC charge on August 10, 1982 as a result of his failure to receive the promotion to corporal (PX 10). He received a right to sue letter on February 18, 1983 and petitioned to intervene in this litigation on March 14, 1983. Intervention was granted on April 7, 1983. His intervention is based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as well as 42 U.S.C. §§ 1981 and 1983.

13. Notwithstanding McNeely's *prima facie* case, defendant Robinson points to an incident which occurred on April 9, 1982 as a legitimate business reason why David Bowers was promoted to corporal on May 15, 1982 in preference to McNeely who was ranked ahead of him by the promotion board. In this incident Deputy Weaver, then acting as radio dispatcher, directed him at 10:10 p.m. to go to Sherwood, a small municipality several miles distant, and help a Sherwood officer serve a child support warrant. At this time McNeely had the driver of an 18 wheel truck under observation. The latter was in a bar in southwest Little Rock and McNeely was apprehensive that the truck driver would attempt to drive the truck in a drunken condition. In view of the situation, McNeely asked the dispatcher to get another officer in the Sherwood area to assist in serving the warrant. McNeely's reluctance to abandon his surveillance led to words with the dispatcher. McNeely felt, with or without justification, that this man did not like him personally or blacks in general. However, he did follow directions to go to Sherwood and assist in serving the child support warrant. McNeely wrote a memo giving his version of this incident on April 16, 1982 (DX 2). His version is not seriously controverted except that defendants' claim that McNeely was working a second job to which he might be late if required to serve the Sherwood warrant. At any rate he did go ahead and make service. His superior Lt. Mike Adams discussed the incident with McNeely and suggested he write the above mentioned memo. Nothing was said about any discipline at the time.

14. On August 12, 1982 the following memo signed by Lt. Mike Adams was placed in the file:

> In reference to the incident involving Deputy McNeely which occurred on April 9, 1982, I have discussed the incident with Deputy McNeely. I advised him that the 1500–2300 shift was responsible for calls up to 2345 hours.

> Due to this incident I recommend a three day suspension without pay. Also, I recommend that Deputy McNeely not be promoted to the rank of Corporal. (DX 3)

This memo is undated and was not in the file on August 10, 1982. Significantly, on August 10, 1982 McNeely filed his EEOC complaint.

15. The above mentioned incident is the principal one given by Sheriff Robinson and concurred in by Major Mark Bowman and Captain James Allen for not promoting McNeely. I find that this reason is plainly pretextual and that the real reason was racial in nature. In the first place, the incident itself is trivial. Second, McNeely had good reason to ask for reconsideration of an order requiring him to abandon observation of a potentially drunken truck driver in favor of serving a child support warrant. Thirdly, when the questioned order was adhered to, McNeely did serve the warrant. To discipline an officer for such conduct would seem to be completely without justi-

fication. I regard it as highly suspicious that no record was made of such discipline until after McNeely had filed an EEOC complaint and until after a white who was lower on the promotion list had been vaulted over him for promotion. The way in which this matter was handled literally reeks with pretext.

16. Two other matters were raised by defendants as justification for the failure to promote McNeely. On July 15, 1981 he was at headquarters at a time when the state police were returning some prisoners to the county jail after Sheriff Robinson had ordered them taken to the penitentiary and chained to the water tower. The prisoners were eventually taken to another jail, but a great deal of controversy surrounded this event. McNeely said that he went in the communication room and was helping the operators with the large volume of calls being received. While there he talked on the phone to a friend who was a member of the state police. He was given a written reprimand because the communication room is supposed to be off-limits to patrol deputies (DX 4). Like the other incident this was an extremely trivial matter. It must have been so regarded because McNeely was recommended by his superiors for promotion long after it occurred. It certainly could not have been regarded seriously or he would not have been placed on the eligibility list in April, 1982. McNeely was one hour late for roll call on July 31, 1982 (DX 5). This occurred after he was passed over for promotion and would seem to have had no bearing whatsoever on the issues involved in this litigation. At any rate McNeely testified without contradiction that an electrical storm knocked out his power and that he was late because his clock showed an erroneous time.

17. In addition to the incident of April 9, 1982 which is discussed, *supra*, Major Bowman testified that he did not recommend McNeely for promotion because he felt that the latter did not set a good example, did not possess leadership qualities and that his work performance was inconsistent. These statements were wholly without the support of specific instances other than the trivialities related above. I find these reasons to be vague, couched in generalities and completely pretextual.

18. The defendant has utterly failed to articulate a legitimate nondiscriminatory reason for the failure to promote McNeely. I find that the reasons given were plainly a pretext for discrimination. I find that on the whole case McNeely has sustained the burden of proving that he was discriminated against by Sheriff Robinson in the latter's failure to promote him to fill the vacancy which existed on May 15, 1982 and was filled by Deputy Bowers, a white. *Texas Dept of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

19. The defendant Robinson is to immediately promote McNeely to the rank of corporal. He is awarded back pay consisting of the difference between a deputy's pay and corporal's pay from and after May 15, 1982.

20. McNeely is awarded his costs and a reasonable attorney fee for his counsel.